JACQUELYN HAYMAN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hayman v. Commissioner
Docket No. 23797-89
United States Tax Court
T.C. Memo 1992-228; 1992 Tax Ct. Memo LEXIS 253; 63 T.C.M. (CCH) 2793; April 20, 1992, Filed *253 Decision will be entered for respondent. James B. Lewis, for petitioner. Bruce Wilpon, for respondent. CLAPP
CLAPP
MEMORANDUM OPINION CLAPP, Judge: Respondent determined the following deficiencies in and increased interest on the underpayment of petitioner and her husband's Federal income taxes: Increased Interest
Year
Deficiency
Sec. 6621(c)
1977
$ 77,799
*
1978
179,581
*
1979
97,016
*
The only issue is whether the innocent spouse provisions under section 6013(e) relieve petitioner of liability for the deficiencies and increased rate of interest. All section references are to the Internal Revenue Code for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. We incorporate by reference the stipulation of facts and attached exhibits. Petitioner resided in New York, New York, when the petition was filed in this case. Petitioner received a bachelor of science degree in retailing from Rochester *254 Institute of Technology in 1963. Petitioner and her husband, John J. Hayman, filed joint Federal income tax returns for the 1977, 1978, and 1979 taxable years. Petitioner separated from her husband in 1983 or 1984. During the years in issue, petitioner was vice president and merchandising director of the Ann Taylor retail clothing store chain, and her annual salary was approximately $ 70,000. Petitioner assisted buyers in selecting merchandise from all over the world, and she directed a design team that produced products for Ann Taylor. Petitioner had an operating budget in the millions of dollars, and she assisted in the planning and review of this budget. During the years in issue, petitioner's husband was a promoter of various tax shelter investments, including Barbour Energy Resources Program (Barbour) and Sand Run Energy Program (Sand Run) and a general partner of Signet Properties (Signet) and Island Properties (Island). Signet and Island were partnerships formed for the purchase and distribution of motion pictures. Barbour and Sand Run were coal extraction projects in which investors purchased interests in a sublease of the rights to mine and remove coal from land in *255 West Virginia. Petitioner's husband discussed some aspects of his business with petitioner. Petitioner and her husband owned interests in one or more of these investments during the years in issue. Petitioner and her husband paid $ 111,250 for their interest in Sand Run. Petitioner issued a check from their joint account in the amount of $ 50,000 on December 30, 1977, and her husband issued a check from his special account in the amount of $ 25,000 on January 16, 1978, to Barbour for an ownership interest in this project. Petitioner executed the following documents in 1977 in connection with the Barbour investment: 1.
Prospective Offeree Questionnaire
2.
Operating Agreement
3.
Revocable Sales Agreement
4.
Sublease Agreement
5.
Addendum to Sublease Agreement
6.
Subscription Agreement and Power of Attorney
7.
Advanced Minimum Annual Royalties Non-Recourse
Promissory Note
8.
Security Agreement
9.
Mining Services Contract
10.
Mining Contract Security Agreement
While petitioner customarily paid the family's monthly bills, her husband attended to the preparation of the joint Federal income tax returns. The returns for the years in issue were prepared by her *256 husband's accountant. This accountant also performed services for her husband's other businesses. Petitioner signed the returns. On the Schedules C, Profit or (Loss) From Business or Profession, attached to their returns, petitioner and her husband claimed losses resulting from their investments in Barbour and Sand Run. Petitioner is listed as the sole proprietor of these coal mining business activities. Respondent has disallowed these losses. On Schedules E, Income (Loss) From Partnerships, petitioner and her husband claimed losses from the Signet and Island partnerships. Respondent has disallowed these losses. In 1984, petitioner and her husband executed Forms 906, Closing Agreement On Final Determination Covering Specific Matters, in which they settled the tax treatment of losses with respect to the Signet and Island partnerships. The terms of the closing agreements provide that for the years in issue, petitioner and her husband are not allowed any deductions for investment credits or for ordinary and capital losses, and that their adjusted bases in both partnerships are zero. Petitioner has conceded the deficiencies in and increased interest determined by respondent *257 in the notice of deficiency. The only question presented is whether petitioner is entitled to relief from liability under the innocent spouse provisions of section 6013(e). There is some confusion, however, because petitioner is claiming innocent spouse relief in connection with adjustments resulting from all of the investments. Respondent argues that petitioner is precluded from claiming innocent spouse relief in connection with the Signet and Island partnerships because: (1) Petitioner and her husband have executed closing agreements in which they agreed to adjustments in connection with these partnerships; and (2) petitioner has not proven that the disallowed deductions from the Signet and Island partnerships had no basis in fact or law at the time claimed on the returns. Sec. 6013(e)(1)(B). In any event, petitioner has presented no evidence to support her claim for innocent spouse relief with respect to the Signet and Island partnerships, and, accordingly, we sustain respondent's determination as to these partnerships. Therefore, in this opinion we deal only with petitioner's claim to innocent spouse relief in connection with the Barbour and Sand Run projects. Petitioner *258 must satisfy several conditions to be relieved from liability under section 6013(e). However, respondent concedes all but the following three conditions, which petitioner must prove to be relieved from liability: (1) The substantial understatement of tax was attributable to grossly erroneous items of her husband; (2) in signing the return she did not know, and had no reason to know, that there was such substantial understatement; and (3) taking into account all the facts and circumstances, it would be inequitable to hold her liable for the deficiency attributable to such substantial understatement. Sec. 6013(e) (1)(B), (C), and (D). 1. Understatement Attributable to Items of Her Husband
Petitioner argues that all of the investments that generated the substantial understatements arose in the course of her husband's business, and that he was the real party in interest. Petitioner contends that she was merely a "nominal purchaser" of these investments and was acting as an agent for her husband. She cites Commissioner v. Bollinger, 485 U.S. 340 (1988), for the proposition that when there is an agency relationship, for Federal income tax purposes, income *259 and deductions are those of the principal and not the agent. Petitioner's husband testified that he considered all of the investments at issue to be his investments. He testified further that he caused the Barbour and Sand Run investments to be made in petitioner's name to avoid an appearance of impropriety which would result from his dual role of promoter and investor of these projects. Although petitioner and her husband testified that the investments in issue were investments solely of her husband, the facts do not support their testimony. Petitioner personally executed a check, withdrawing $ 50,000 from the couple's joint account, to the Barbour project, and she individually executed numerous documents in her capacity as co-owner of or investor in this project. Some of the documents submitted into evidence described in detail the operation of the project and the rights and liabilities of owners. The parties submitted into evidence a letter dated November 18, 1986, from the president of the Sand Run project in which he stated that, "Jacquelyn Hayman and her husband paid $ 111,250 in cash for an aggregate of 4.45 units in the Program." Petitioner personally executed joint *260 income tax returns which listed her as the sole owner of these coal extraction projects. Petitioner had a financial stake in the coal extraction projects; she was provided with and was sole signatory of agreements that evaluated the merits and risks of the projects; and she, as well as her husband, was considered by third parties to be an investor in the Sand Run project. Petitioner contends that she was acting as her husband's agent with respect to these coal extraction projects. Both she and her husband allege that her involvement was merely an accommodation to him. However, we find it difficult to comprehend petitioner's husband's statement that, although these were actually his investments, he caused them to be made in his wife's name because "for me to be both the recipient of and the giver of the funds might be construed as improper." If he were truly concerned about impropriety, he would have arranged for petitioner to be the real owner, and if he were concerned about the appearance of impropriety, he would not have allowed himself to be a co-owner. Petitioner's husband's positions are not consistent. Petitioner relies on Bloch v. Commissioner, 6 B.T.A. 563 (1927), *261 to support her agency theory. In Bloch, taxpayer husband in 1917 arranged for shares of stock to be issued in his wife's name. In 1919, he requested that she endorse the certificate for the shares in blank, and in 1920, he sold the shares at a loss. Respondent disallowed the loss to the taxpayer, contending that the stock shares were actually property of his wife. This Court allowed the taxpayer's loss, as the record showed that he purchased the stock with property interests he had acquired before he was married; that he intended the stock to be his own property; his wife never knew that the stock was in her name until she was required to endorse it; and she never had possession or control of the certificate. In Bloch, we found that at all times the wife never had any real interest in the stock, that it was the taxpayer's property, and accordingly, the loss sustained on the sale of the stock was attributable to taxpayer. We find the facts of Bloch to be inapposite to the instant case. We are persuaded that petitioner was an investor in these projects, either alone or with her husband. She has not proven that the tax was attributable to her husband alone, as required *262 by the statute. Sec. 6013(e) (1)(B). 2. Knowledge of or Reason to Know
Respondent contends that petitioner had actual knowledge of the transactions giving rise to the understatement in issue and, therefore, she has failed to satisfy section 6013(e) (1)(C). Under this section, a spouse seeking relief from liability must establish that "in signing the return he or she did not know, and had no reason to know, that there was such substantial understatement" attributable to grossly erroneous items. Petitioner knew about the transactions which gave rise to the understatements. She had been provided with a "Confidential Descriptive Memorandum" for each of the coal extraction projects, and a cursory glance at the Schedules C attached to her income tax returns would have brought to her attention the deductions claimed and the stated reasons therefor. (We note that for 1979, the understatement resulted primarily from respondent's disallowance of a carryforward of net operating loss from 1978 resulting from the coal extraction projects. While for this year, a cursory review of Schedule C would not have given petitioner a reason to know about the transactions or underlying circumstances *263 which gave rise to the understatement, a review of the forms attached to the return -- Net Operating Loss Deduction -- 1979 -- would have done so.) Petitioner's husband testified that she could have asked him any questions she might have had concerning these investments. We find that petitioner knew that the losses claimed on the returns were attributable to deductions claimed in connection with their investments in the coal extraction projects. Petitioner testified that she could not recall whether she reviewed the income tax returns before signing them, nor could she recall whether she was "shocked" by the large amount of losses claimed. She testified further that she trusted her husband on such matters. However, petitioner's husband testified that at some point she asked him whether the investments were "legal". Petitioner was an educated woman with a successful career and business acumen. She managed the family's budget and was involved in the planning and execution of a substantial business budget. Petitioner at all times had access to information regarding these coal extraction projects; for 2 of the 3 years in issue the deductions claimed as a result of these projects *264 were greater than the amount of their income reported; for each of the years in issue, petitioner and her husband received a refund of virtually all of the Federal income taxes that had been withheld from petitioner's salary; and petitioner had questioned the legality of these investments. Petitioner knew, or had reason to know, that the deductions claimed were suspect. See Jackson v. Commissioner, T.C. Memo. 1990-520. We find that petitioner should have known that the liabilities stated on the returns were erroneous or at least that further investigation was warranted. Stevens v. Commissioner, 872 F.2d 1499 (11th Cir. 1989), affg. T.C. Memo. 1988-63. 3. Inequitable to Hold Her Liable
There was no evidence to indicate that petitioner did not share in the tax benefits resulting from the tax shelter deductions. The benefits were almost exclusively the refund of taxes withheld from petitioner's salary. Petitioner has not carried her burden of proof to show that it would be inequitable to hold her liable for the taxes on the joint returns. Decision will be entered for respondent *265 . Footnotes
*. 120 percent of the adjusted rate of interest.↩