Jacquelyn HAYMAN, Petitioner–
Appellant,

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent–
Appellee.**

No. 733, Docket 92–4110.

United States Court of Appeals,
Second Circuit.

Argued Dec. 29, 1992.

Decided May 4, 1993.

James B. Lewis, Director, Student Tax Clinic Benjamin N. Cardozo School of Law, New York City, for petitioner-appellant.

Marion E.M. Erickson, Attorney, Tax Div., Dept. of Justice, Washington, DC (James A. Bruton, Acting Asst. Atty. Gen., Gary R. Allen and Ann B. Durney, Attorneys, Tax Div., Dept. of Justice, Washington DC, of counsel), for respondent-appellee.

Before: OAKES, MINER and McLAUGHLIN, Circuit Judges.

MINER, Circuit Judge:

Petitioner-appellant Jacquelyn Hayman ("Hayman") appeals from a decision entered April 21, 1992 in the United States Tax Court (Clapp, *J.*) sustaining the deficiency determinations made by respondent-appellee Commissioner of Internal Revenue ("Commissioner") and assessed jointly against her and her husband John Hayman ("John") for the taxable years 1977, 1978 and 1979. The Haymans reported losses from tax shelters that substantially offset their reported income for these years. The Commissioner disallowed the deductions, finding, *inter alia*, that the shelters were not activities entered into for profit. On appeal, the Tax Court affirmed the Commissioner's determinations and rejected Hayman's claim for relief from liability as an innocent spouse under I.R.C. § 6013(e). For the reasons that follow, we affirm.

## BACKGROUND

Hayman received a bachelor of science degree in retailing from the Rochester Institute of Technology in 1963. During the years that are the subject of this appeal, she was vice president and merchandising director for the Ann Taylor retail clothing store chain, earning an annual salary of approximately $70,000. She assisted buyers in selecting merchandise from around the world; directed a design team that produced products for Ann Taylor; and was assigned responsibility for an operating budget in the millions of dollars.

John, during the same period of time, was a promoter of various tax shelter investments, including Barbour Energy Resources Program ("Barbour") and Sand Run Energy Program ("Sand Run"). He also was a general partner of Signet Properties ("Signet") and Island Properties ("Island"). Barbour and Sand Run were coal extraction projects in which investors purchased interests in a sublease granting the right to mine and remove coal from land located in West Virginia. Signet and Island were partnerships formed to purchase and distribute motion pictures. Although Hayman discussed some aspects of John's business with him and knew that he was in the "tax shelter syndication business," she testified that she did not understand what he did for a living. The Haymans, who separated in 1984, lived in a rented Manhattan apartment and employed a full-time housekeeper. Their two children attended private school.

The Haymans jointly invested $111,250 in Sand Run. They also invested $75,000 in Barbour: Hayman issued a check from their joint account for $50,000 on December 30, 1977, and John issued a check from his special account for $25,000 on January 6, 1978. In connection with the Barbour investment, Hayman signed ten documents, including a Prospective Offeree Questionnaire, an Operating Agreement, a Revocable Sales Agreement, a Sublease Agreement, an Addendum to Sublease Agreement, a Subscription Agreement and Power of Attorney, an Advanced Minimum Annual Royalties Non–Recourse Promissory Note, a Security Agreement (Sublease and Note), a Mining Services Contract and a Mining Contract Security Agreement. Hayman also was provided with a Confidential Descriptive Memorandum (a private placement memorandum) for each investment. The memoranda contained lengthy opinions of tax counsel in support of the claimed losses.

Hayman claims that she signed the investment documents at John's request without understanding them. Even though the coal mining investments were in Hayman's name, John testified that they were his because he paid for them out of his profits as a tax shelter promoter. When Hayman asked John whether the coal investments were legal, he assured her that they were.

The Haymans filed joint tax returns for the years 1977, 1978 and 1979. Although Hayman was responsible for paying the family's bills, John prepared the returns with the assistance of a certified public accountant,

who signed them as a paid preparer. Although Hayman signed all the returns, she did so in 1977 and 1978 on the last day allowed under an extension. The Haymans claimed on the returns the following losses due to their investments in Barbour and Sand Run: $193,598 (1977); $538,414 (1978); and $124,319 carry forward (1979). In each year, the claimed losses resulted in all or virtually all of the tax that had been withheld from the Haymans' salaries being refunded. In 1977 and 1978, their claimed deductions were greater than their combined incomes. Hayman did not receive any asset of significant value from John during 1977, 1978 or 1979, and her net worth at the end of each of those three years was zero. Hayman testified that she was not shocked by the large losses claimed on the returns because she knew that John's business "dealt in those kinds of numbers." Hayman was listed on each year's return as the sole proprietor of the Barbour investment and co-owner with John of Sand Run, due to a purported concern that John's dual role as promoter and investor could have been construed as improper. The Commissioner disallowed the losses claimed on these two investments as well as the losses claimed on the Signet and Island investments.

On June 29, 1989, the Commissioner issued a notice of deficiency, finding that due to the disallowed losses claimed for the Barbour, Sand Run, Signet and Island partnerships, the Haymans underreported their gross income for the tax years 1977, 1978 and 1979, in the amounts of $77,799, $179,581 and $97,016, respectively. On September 28, 1989, Hayman filed a petition in the Tax Court for a redetermination of deficiencies in income tax, claiming that she was entitled to relief from liability as an innocent spouse pursuant to I.R.C. § 6013(e).

The Tax Court held a one day trial and, on April 20, 1992, filed a memorandum opinion finding that Hayman could request relief from liability as an innocent spouse only with respect to Barbour and Sand Run. *See Hayman v. Commissioner*, 63 T.C.M. (CCH) 2793, 2794 (1992). As to the Signet and Island partnerships, the Haymans had executed an agreement barring any further claims. The Tax Court confirmed the deficiencies assessed by the Commissioner and concluded that Hayman failed to qualify under the statute as an innocent spouse. *See id.* at 2794–96. The Tax Court also determined that Hayman was liable for interest on the deficiencies under I.R.C. § 6621(c) at 120% of the adjusted interest rate. Hayman appeals from the decision of the Tax Court.

## DISCUSSION

Spouses who file joint returns are jointly and severally liable for the full amount of tax due on their combined incomes, I.R.C. § 6013(d)(3) (1988); *see Stevens v. Commissioner*, 872 F.2d 1499, 1503 (11th Cir.1989). This is so, "regardless of the source of the income or of the fact that one spouse may be far less informed about the contents of the return than the other." *Sonnenborn v. Commissioner*, 57 T.C. 373, 381 (1971). The harshness of this rule partially is mitigated by the "innocent spouse" defense. *See* Act of Jan. 12, 1971, Pub.L. No. 91–679, § 1, 84 Stat. 2063, 2063 (codified as amended at I.R.C. § 6013(e) (1988 & Supp. III 1991)).

In enacting the innocent spouse defense codified in section 6013(e), Congress was responding to instances where imposition of joint and several liability resulted in "grave injustice." *See* S.Rep. No. 1537, 91st Cong., 2d Sess. 2, *reprinted in* 1970 U.S.C.C.A.N. 6089, 6090 (1970). As originally enacted, the statute granted relief where: (i) gross income attributable to the prospective noninnocent spouse in an amount exceeding twenty-five percent of the gross income stated in the joint return (ii) had been omitted from the return without the knowledge of the prospective innocent spouse (iii) under circumstances in which it would be inequitable to treat that spouse as liable for the deficiency attributable to the omission. *See* 84 Stat. at 2063. The Senate report accompanying the 1971 enactment of section 6013(e) observed as to the knowledge element that this "condition imposes upon the innocent spouse the burden of showing that he or she did not know of, and had no reason to know of, the omission from income." S.Rep. No. 1537, at 3, *reprinted in* 1970 U.S.C.C.A.N. at 6091.

In 1984, Congress amended section 6013(e), *see* Deficit Reduction Act of 1984 (the "Act"), Pub.L. No. 98–369, § 424, 98 Stat. 494, 801–03 (codified at I.R.C. § 6013(e) (1988 & Supp. III 1991)), making three important substantive changes. First, the twenty-five percent omission-of-gross-income test was replaced by a substantial-under-statement-of-tax test, I.R.C. § 6013(e)(1)(B), and relief for grossly erroneous items was extended to include claims for a deduction, credit, or basis attributable to the prospective noninnocent spouse for which there was no basis in fact or law, *id.* §§ 6013(e)(1)(B), 6013(e)(2)(B). Second, as to the lack of knowledge requirement, "substantial under-statement" (revised section 6013(e)(1)(C)) was substituted for "omission" (former section 6013(e)(1)(B)). Substantial understatement was then defined as any liability greater than $500. *See* I.R.C. § 6013(e)(3). Third, section 6013(e)(1)(D) was revised to impose a test of equity. As originally enacted, the statute required that the "other spouse [did not] significantly benefit[ ] directly or indirectly from the items omitted from gross income" and that, under the circumstances, it was "inequitable to hold the other spouse liable for the deficiency" attributable to the omission. 84 Stat. at 2063. As amended, section 6013(e)(1)(D) now requires the taxpayer to demonstrate that, in light of all of the relevant facts and circumstances, it is "inequitable to hold the other spouse liable for the deficiency ... attributable to such substantial understatement." Although no longer a specific requirement of section 6013(e)(1)(D), the existence of a significant benefit to the spouse claiming relief nevertheless is still to be considered in determining whether it would be "inequitable" to hold that spouse liable for a deficiency. H.R.Rep. No. 432 (pt. 2), 98th Cong., 2d Sess. 1501–02, *reprinted in* 1984 U.S.C.C.A.N. 697, 1142–44; *Estate of Krock v. Commissioner,* 93 T.C. 672, 678, 1989 WL 148355 (1989).

■ Relief from joint and several liability under section 6013(e) therefore is available to a taxpayer who has filed a joint income tax return and who establishes: (i) that a "substantial understatement" of tax has resulted from a "grossly erroneous item" attributable to the other spouse; (ii) that, in signing the return, the taxpayer establishes that she "did not know, or have reason to know" of that understatement; and (iii) that, in light of the facts and circumstances, it is "inequitable" to hold the nonculpable spouse liable for the resulting deficiency. I.R.C. § 6013(e)(1); *see Shenker v. Commissioner,* 804 F.2d 109, 113 (8th Cir.1986), *cert. denied,* 481 U.S. 1068, 107 S.Ct. 2460, 95 L.Ed.2d 869 (1987). Because the statute is phrased in the conjunctive, a spouse claiming relief under section 6013(e) must satisfy each of the requirements in order to qualify for relief. *Stevens,* 872 F.2d at 1504.

Here, the parties have stipulated that the claimed losses due to the investments in Barbour and Sand Run were "grossly erroneous items" within the meaning of section 6013(e)(2)(B). Accordingly, to be entitled to relief, Hayman must establish that: (i) the grossly erroneous items were solely attributable to John; (ii) she neither knew nor had reason to know of the substantial understatements; and (iii) taking into consideration all the circumstances, it would be inequitable to hold her liable. The Tax Court's determination of whether a spouse is entitled to relief from liability under I.R.C. § 6013(e) turns largely on its findings of fact, which we review under the "clearly erroneous" standard. *Bausch & Lomb, Inc. v. Commissioner,* 933 F.2d 1084, 1088 (2d Cir.1991).

## A. Attribution to Other Spouse

■ Hayman contends that the investments in Barbour and Sand Run were John's and that they were made in her name out of concern that it might be "construed as improper" for John to be both a promoter and an investor in the tax shelters. Hayman also asserts that John paid for the investments out of his income as a tax shelter promoter and that, because he was the true owner of the investments, the deductions comprising the grossly erroneous items were solely attributable to him.

The Tax Court properly rejected these arguments. Hayman issued a check from a joint account for $50,000, a large sum by her own admission, to pay for the investment in Barbour. She also signed ten documents, which disclosed all relevant details of the

Barbour investment. Moreover, the joint returns listed Hayman as the sole owner of Barbour and as the co-owner of Sand Run.

John was listed as a co-owner of the investment in Sand Run and contributed $25,000 from his special account to the investment in Barbour. It is therefore difficult to accept Hayman's argument concerning a desire to conceal the appearance of impropriety. The Tax Court correctly observed that, if propriety were a legitimate concern, John would have argued that Hayman was the true owner of Barbour rather than his nominee. As to Sand Run, the Tax Court also noted that if the Haymans were concerned only about the appearance of impropriety, John would not have been named a co-owner.

## B. Knowledge

The Tax Court's decision did not clearly articulate the test it applied to determine whether Hayman satisfied the lack of knowledge requirement of section 6013(e)(3). This is the first opportunity our Court has had to construe the statutory lack of knowledge requirement in the context of a disallowed deduction case. Other courts have applied various tests to determine whether the requirement has been met. *See, e.g., Erdahl v. Commissioner,* 930 F.2d 585 (8th Cir.1991) (whether taxpayer knew or had reason to know that the deduction would give rise to a substantial understatement); *Price v. Commissioner,* 887 F.2d 959 (9th Cir.1989) (same); *Stevens,* 872 F.2d at 1505 (whether the alleged innocent spouse knew or had to know that the returns contained phony deductions); *United States v. Flomenhoft,* No. 86–C–1588, 1987 WL 7598 (N.D.Ill. Mar. 2, 1987) (whether taxpayer had knowledge of the understatement of tax therein), *aff'd,* 843 F.2d 500 (7th Cir.1988); *Depew v. Commissioner,* 55 T.C.M. (CCH) 84, 1988 WL 8667 (1988) (whether the spouse did not know or have reason to know of the transaction giving rise to the understatement).

■ In cases involving the omission of income, the relevant inquiry is whether the taxpayer knew or should have known of an income producing transaction that her spouse failed to report on their joint return. *Erdahl,* 930 F.2d at 589. In adopting the *Price*

standard, the *Erdahl* court observed that in omitted income cases "[m]ere knowledge of the underlying transaction that produced the omitted income is sufficient to deny innocent spouse relief." *Id.* However, as noted in *Price,* applying this test in deduction cases "would for the most part wipe out innocent spouse protection." *Price,* 887 F.2d at 963 n. 9; *see Erdahl,* 930 F.2d at 589. We therefore adopt the test articulated by the Ninth Circuit in *Price* and followed by the Eighth Circuit in *Erdahl:* To satisfy the knowledge element of section 6013(e), a taxpayer must establish that "she [or he] did not know and did not have reason to know that the deduction would give rise to a substantial understatement." *Price,* 887 F.2d at 963; *see Erdahl,* 930 F.2d at 589.

With respect to the taxpayer's reason to know, "the more a spouse knows about a transaction ... the more likely it is that she will know or have reason to know that the deduction ... may not be valid." *Price,* 887 F.2d at 963 n. 9. In other words, the question is whether "a reasonably prudent taxpayer in her position at the time she signed the return could be expected to know that the return contained the substantial understatement." *Id.* at 965. To answer this question, we must consider the following factors: (i) the spouse's level of education; (ii) the spouse's involvement in the family's business and financial affairs; (iii) the presence of expenditures that appear lavish or unusual when compared to the family's past levels of income, standard of living and spending patterns; and (iv) the culpable spouse's evasiveness and deceit concerning their finances. *Id.; see also Erdahl,* 930 F.2d at 591 (the taxpayer was entitled to innocent spouse relief because "a reasonably prudent taxpayer *in her position* " would not have had reason to question the legitimacy of the deduction).

Applying the *Price* test, we find that Hayman fails to qualify as an innocent spouse. First, ignorance of the attendant legal or tax consequence of an item that gives rise to a deficiency is no defense for one seeking to obtain innocent spousal relief. *Price,* 887 F.2d at 964. Regardless of whether the spouse possesses knowledge of the tax consequences of a deduction, she is considered as a

matter of law to have reason to know of the substantial understatement and is precluded from proving otherwise. *Id.*

■ Here, Hayman knew of the existence of the coal mine ventures and the large deductions on the returns. Her signatures on the ten documents relating to the Barbour partnership; her check for $50,000; her education; her involvement in the family's financial affairs; her business experience; and John's lack of deceit all support a conclusion that she knew or should have known, *id.* at 963, of the understatements due to the substantial deductions claimed. She was provided with a Confidential Descriptive Memorandum for each of the tax shelter investments and therefore was fully cognizant of, or at least had ready access to, sufficient information regarding the investments to put her on notice that there may have been a resulting substantial understatement of their tax liability.

■ Although Hayman claims to have signed the returns without reading them, she nevertheless is charged with constructive knowledge of their contents. *Schmidt v. United States*, 5 Cl.Ct. 24, 27 (1984); *Levin v. Commissioner*, 53 T.C.M. (CCH) 6, 8, 1987 WL 40119 (1987). Indeed, even a cursory glance at the return would have brought the deductions to her attention, especially since for two of the three years in issue the losses claimed from the tax shelter investments were larger than the income reported by Hayman and her husband.

■ Tax returns setting forth large deductions, such as tax shelter losses offsetting income from other sources and substantially reducing or eliminating the couple's tax liability, generally put a taxpayer on notice that there may be an understatement of tax liability. *See Levin*, 53 T.C.M. at 8; *Cohen v. Commissioner*, 54 T.C.M. (CCH) 944, 1987 WL 48831 (1987). A would-be "innocent spouse" cannot rely on "ignorance of law" as a defense. *Price*, 887 F.2d at 964. In order to qualify, therefore, the spouse must establish that she is unaware of the circumstances that gave rise to the error on the tax return, not merely of the tax consequences flowing from those circumstances. Accordingly, there were ample grounds for the Tax Court

to conclude that Hayman had "reason to know" of the understatement, and its findings of fact are not clearly erroneous.

## C. The Equities

■ The Tax Court also correctly concluded that Hayman failed to demonstrate that it would be "inequitable" within the meaning of section 6013(e)(1)(D) to hold her liable for the tax. Whether it is inequitable to hold a spouse liable for a deficiency is to be determined "taking into account all other facts and circumstances." I.R.C. § 6013(e)(1)(D); *Estate of Krock*, 93 T.C. at 677. Although no longer a specific requirement of the statute, the existence of a significant benefit to the spouse claiming relief nevertheless is a material factor to be considered in determining whether it would be inequitable to hold that spouse jointly liable. *Estate of Krock*, 93 T.C. at 678; *Purcell v. Commissioner*, 86 T.C. 228, 242 (1986), *aff'd*, 826 F.2d 470 (6th Cir.1987), *cert. denied*, 485 U.S. 987, 108 S.Ct. 1290, 99 L.Ed.2d 500 (1988). Although "normal support" is not considered a significant benefit for this purpose, *Flynn v. Commissioner*, 93 T.C. 355, 367, 1989 WL 107095 (1989), unusual or lavish support or gifts to the spouse seeking relief are considered even when the benefit is received "several years after the years in which the omitted item should have been included in gross income." *Estate of Krock*, 93 T.C. at 679.

Whether the failure to report correctly tax liability results from "concealment, overreaching, or any other wrongdoing" on the part of the "guilty" spouse is also relevant. Where the understatement results from "a misapprehension of the income tax laws by the preparers of the tax returns and the signatory parties," both husband and wife are perceived to be "innocent," and there is "no inequity in holding them both to joint and separate liability." *McCoy v. Commissioner*, 57 T.C. 732, 735, 1972 WL 2489 (1972).

Here, Hayman has not alleged that she was misled by John, but only that she relied on him to take care of the tax returns and signed them in the belief that they were correct because she trusted him. Since Hayman has not shown that the substantial un-

derstatements were attributable to any dishonesty or concealment on John's part, or to anything other than a misapprehension of the income tax laws by the preparer of the tax return and the signatories, it is not inequitable to hold them both jointly liable.

Moreover, Hayman offered no evidence to show that she did not share in the tax benefits resulting from the tax shelter deductions. She argues that it would be inequitable to hold her liable for the tax deficiency because: her lifestyle was not extravagant; John did not give her "unusual or lavish" gifts; she had no net worth during the years in issue; and she and John are now separated. However, Hayman's failure to accrue any net worth during the years in issue and John's failure to give her expensive gifts are not determinative. Although there is no evidence showing that her lifestyle was lavish, she and her family did maintain a comfortable lifestyle, and it is indisputable that they were able to maintain a higher standard of living because of the significant tax benefits accruing from the disallowed deductions. Furthermore, that Hayman and John have been separated since 1984, but are not divorced, does not weigh heavily in her favor. John has not disappeared and left Hayman to "face the music" alone, and she has not been deserted in the sense foreseen by the legislators who enacted the innocent spouse defense.

Viewing all the circumstances surrounding the "substantial understatements," it would not be inequitable to hold Hayman liable for the deficiencies. Hayman should have known that "substantial understatements" would be caused by the disproportionately large losses generated by tax shelters she personally invested in, losses claimed on tax returns she willingly signed without asking any questions. Hayman chose to turn a blind eye and trust John on financial matters, even though she admits she did not understand his business and was sufficiently troubled to inquire whether the tax shelter investments were legal. Hayman does not allege that she was misled or deceived by John or their accountant. She freely shared in the benefits of the tax deductions and yet now claims that it would be unfair to hold her liable for the resulting tax deficiencies.

Therefore, the Tax Court did not err in finding that Hayman failed to show that it would be inequitable to hold her liable.

## CONCLUSION

For the foregoing reasons, the decision of the Tax Court is affirmed.