T.C. Memo. 2004-79

UNITED STATES TAX COURT

RENEE TRUPIN D'AUNAY, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 10066-00.          Filed March 22, 2004.

Renee Trupin D'Aunay, pro se.

<u>Scott E. Fink</u> and <u>Donald A. Glasel</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

COHEN, <u>Judge</u>:  This proceeding was commenced under section 6015 for review of respondent's determination that petitioner is not entitled to relief from joint and several liability with respect to joint returns filed with Barry Trupin (Trupin) for 1982 through 1986.  Unless otherwise indicated, all section

references are to the Internal Revenue Code, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Petitioner's Background and Lifestyle

Petitioner attended the University of Oklahoma, where she received an undergraduate degree in interior design and painting. In 1971, she received a masters in art history. Petitioner married Trupin on September 23, 1982, after executing an antenuptial agreement. Petitioner and Trupin executed a separation agreement on April 23, 1993. The separation agreement provided in part:

> The parties acknowledge that there are certain tax deficiency claims pending against them with respect to joint Federal income tax returns filed by them. Notwithstanding anything to the contrary contained herein, the Husband hereby assumes responsibility for any and all potential liabilities, including, but not limited to, penalties, interest and expenses arising out of such claims and he hereby agrees to hold the Wife harmless from and to indemnify the Wife against the same.

The separation agreement contained a mutual release of any debts or obligations between Trupin and petitioner other than those set forth in the separation agreement. Petitioner married Brice D'Aunay (D'Aunay) in France on June 5, 1993.

Trupin was the chairman of the board of Rothschild Reserve International (RRI) and controlled various subsidiary and affiliated corporations. Petitioner was an employee and/or senior vice president of RRI from 1979 to 1984. RRI structured

and sold limited partnerships for tax advantages.  As senior vice president of RRI, petitioner worked with investors and their banks to obtain letters of credit, which were then discounted.

After her marriage to Trupin, petitioner spent substantial amounts of time furnishing and arranging for repair and painting of various residences acquired by Trupin or corporations owned or controlled by him.  Petitioner knew that the decorating expenditures were paid by Trupin's corporations.  Although petitioner was not regularly employed in the office of RRI after 1983, she received salaries from Trupin's corporations as follows:

| | | |
|---|---|---|
| RRI | 1983 | $102,392.00 |
| | 1984 | 52,532.60 |
| Prudential American Realty Corp. | 1984 | 50,000.00 |

No income tax was withheld from petitioner's income from RRI or Prudential American Realty Corp. (Prudential).

During 1982 through 1986, petitioner and Trupin enjoyed a lavish lifestyle, accumulating, through the use of the corporations owned and controlled by Trupin, elaborate houses, furnishings, automobiles, art, and jewelry.  They made extensive personal use of a 105-foot yacht, known as Tara T, that was owned and controlled by a corporation.  The yacht had a crew of five during 1982 through 1986.  Corporate credit cards were used to pay personal expenses of petitioner and Trupin.

Petitioner and Trupin filed joint Federal income tax returns for 1982 through 1986. They reported taxable income of $36,648, $56,181, $72,755, none, and none, on those returns, respectively. On the tax returns, a "W" was placed next to items to signify that the item was attributable to petitioner. On the 1982 and 1983 returns, a "W" was placed next to losses of $152,073 and $223,155, respectively, from American National Associates 367 (ANA 367).

Trupin's tax shelter business began a rapid decline as a result of changes in the tax law in 1986. In a letter dated July 15, 1987, in relation to a requested extension of time to file RRI's tax return for the year ended October 31, 1986, RRI's accountants represented:

> The extension requested is for the fiscal year ended October 31, 1986. Through 1985 the taxpayer's organization employed approximately 50 people in the headquarter's office which included 12-15 accounting and financial personnel. After 1985, the Rothschild organization has had no sales whatsoever of its products i.e., commercial real estate and leased computer equipment, from which it had previously derived its income. In fact, it is estimated that losses of $2,000,000 to $5,000,000 may have been realized, virtually eliminating the corporation's equity. Because of the sudden decimation of the taxpayer's business, only three part time (out of 50 full time) personnel remain to handle the administration of the corporation's business.

> The corporation, in the last six months, had to abandon its offices at 888 Seventh Avenue, and has moved twice. In the chaos of multiple moves with minimum personnel, hundreds of transfiles were loaded and placed in storage. The task of locating and retrieving needed information in order to properly file

a return is an exceedingly laborious one. In 1986 the corporation was terminating its involvement in approximately 400 leasing transactions which must be properly analyzed.

Petitioner was aware that Trupin had cashflow problems in 1987. Petitioner was also aware that 1986 tax law changes had adversely affected the viability of Trupin's tax shelter businesses. She signed a letter dated October 31, 1984, resigning as an officer of The Rothschild Collection, Ltd.; yet, on August 6, 1987, petitioner executed, as president, a Certificate of Amendment of the Certificate of Incorporation of The Rothschild Collection, Ltd.

Notwithstanding financial difficulties resulting from the decline of Trupin's tax shelter businesses, petitioner continued much of the lifestyle that she had previously enjoyed, driving one or more Rolls Royce automobiles; acquiring residential properties and a boat; and dealing in antiques, art, and jewelry as set forth below. Beginning in 1986, petitioner and Trupin maintained separate residences. They continued to cooperate, however, with respect to the disposition of assets and, ultimately, in transferring assets outside of the United States, as set forth below. Petitioner did not file a Federal income tax return for any year from 1987 through 2001.

In 1986, Trupin purchased a home in Tortola, British Virgin Islands (Tortola), for petitioner for $150,000. In 1988, Trupin and petitioner began incorporating companies outside the United

States.  On April 21, 1988, petitioner created Blue Lotus Holdings Ltd. (Blue Lotus) in the British Virgin Islands.  Trupin paid $1,500 for the formation of Blue Lotus.  There was no business purpose for the formation of Blue Lotus.  Blue Lotus was subsequently used as an alter ego of petitioner for, among other things, holding title to her residence and for selling artwork and other items at Sotheby's in New York City, New York.

In December 1988, petitioner purchased a Regal 360 Commodore boat, named Black Lotus, for $140,000.  Trupin paid $35,000 as a downpayment on the boat.  Petitioner financed the balance of the boat, providing false financial information to the lender.  The boat was stored in the Virgin Islands.  As of December 1988, petitioner owned a Rolls Royce Silver Spur and a 1988 Jeep Wrangler.

Between September 5, 1989, and October 24, 1994, petitioner received at least $958,538 from Trupin as proceeds from the disposition of residences and other assets owned by Trupin or corporations controlled by Trupin.

IRS Assessments

The first letter of proposed deficiency, which allowed Trupin and petitioner an opportunity for administrative review in the Internal Revenue Service (IRS) Office of Appeals, for 1982 and 1983 was mailed on September 5, 1990.  The first letter of proposed deficiency, which allowed Trupin and petitioner an

opportunity for administrative review in the IRS Office of Appeals, for 1984 was mailed on March 6, 1991.

On June 19, 1992, and October 8, 1992, respondent sent notices of deficiency to petitioner and Trupin for 1982 through 1986. For 1982 through 1986, respondent determined deficiencies of $503,139, $443,704, $1,265,273, $2,939,540, and $215,003, respectively, and additions to tax pursuant to section 6661 of $125,785, $110,926, $316,318, $734,885, and $53,751, respectively. In the notices of deficiency for 1982 through 1986, respondent determined that petitioner and Trupin received additional income from their unreimbursed personal use of the corporate yacht of $706,077, $603,012, $941,859, $663,312, and $765,000, respectively.

In the notice of deficiency for 1982 and 1983, respondent disallowed the partnership losses from petitioner's investment in ANA 367 of $152,073 and $223,155, respectively, and investment interest expenses in 1983 for ANA 367 of $107,260.

On August 3, 1992, a petition was filed in this Court at docket No. 17389-92 on behalf of Trupin and petitioner contesting their Federal income tax liabilities for 1982 and 1983. On December 3, 1992, another petition on behalf of petitioner and Trupin was filed in this Court at docket No. 26819-92 contesting liabilities determined for 1984, 1985, and 1986. On June 1, 1993, a stipulation of settled issues was filed with respect to

certain adjustments at issue at docket No. 26819-92. On December 28, 1993, an Order of Dismissal and Decision was entered in each case. In December 1995, petitioner, through counsel, filed motions for leave to file motions to vacate decisions, contending that the petitions were not filed with her authority or consent. On November 19, 1996, petitioner's oral motions to withdraw her motions for leave to file motions to vacate decisions were granted. Thus, without regard to her claims under section 6015, the liability of petitioner and Trupin for the deficiencies for the years in issue was established by decisions now final.

As a result of the decisions entered against petitioner and Trupin in 1993, deficiencies, penalties, and additions to tax were assessed against petitioner and Trupin. (As of June 9, 2003, the balances owing were $764,662.23 for 1982; $2,125,829.90 for 1983; $3,812,646.14 for 1984; $7,923,698.68 for 1985; and $527,321.23 for 1986.)

Petitioner's Conduct

In April 1993, 75 pieces of crated material were held in storage in Pennsylvania in the name of petitioner. The crated material had been removed from mansions previously owned by Trupin's entities and used or intended as residences of petitioner and Trupin. In April 1993, at Trupin's request,

petitioner caused approximately 65 crates to be shipped to Trupin in Vancouver, Canada.

From October 1986 through June 1994, petitioner and/or Trupin lent a concert grand piano and two stools worth $1 million to the Museum of Fine Arts in Boston. On June 22, 1994, petitioner requested that the piano be removed from the Museum of Fine Arts and shipped to Trupin in Washington State.

On December 15, 1986, petitioner purchased property in Claverack, New York (Claverack property), without a mortgage. On June 12, 1992, title to the Claverack property was transferred to Blue Lotus. Various items of furniture, collectibles, and other valuable property were stored in crates and containers in or on the Claverack property. On June 15, 1995, the IRS seized the Claverack property and its contents as part of its collection efforts with respect to the amounts owed by petitioner and Trupin for 1982 through 1986. On June 27, 1995, the IRS changed all of the locks on the Claverack property and placed on the property notification that the seizure had occurred. Thereafter, petitioner illegally entered the Claverack property and removed paintings and other items. She was indicted as a result. In February 1997, petitioner entered into a plea agreement in the U.S. District Court for the Northern District of New York, in which she pleaded guilty to a violation of section 7212(b), to

wit, the forcible rescue of seized property.  In the plea agreement, petitioner agreed to the following:

6.  The defendant is pleading guilty because she is in fact guilty of the charge contained in Count One of Indictment 96-CR-361.  In pleading guilty to this count, the defendant acknowledges that, if she elected to go to trial, the United States would prove, beyond a reasonable doubt, all of the facts set forth in paragraph 7, and further acknowledges that those facts would support her conviction on the charge contained in Count One of Indictment 96-CR-361.  The defendant also specifically admits the following facts as true, and declares these facts to be true under the penalties of perjury to Title 18, United States Code, Section 1746:

7.  <u>Statement of Relevant Facts</u>:

On or about June 27, 1995, in the Northern District of New York, the defendant <u>Renee V. Trupin also known as Renee Daunay and Renee Virginia Cornelius</u> did unlawfully, knowingly and forcibly rescue and cause to be rescue property that had been seized by the Internal Revenue Service.  Specifically, the defendant entered buildings and real property located at One Block Lane, Claverack, New York, knowing that property had been seized by the United States.

At all times, the defendant acted knowingly, intentionally, willfully and not by mistake or other innocent reason.

*     *     *     *     *     *     *

17.  The defendant hereby agrees to pay restitution to all persons and entities who suffered a monetary loss as a result of the defendant's misconduct, whether or not embraced in the counts of the defendant's conviction, and whether or not the defendant derived any direct financial benefit therefrom.  The defendant specifically agrees to surrender, assign, and transfer those three paintings removed from the premises at One Block Lane, Claverack, New York to the Internal Revenue Service and acknowledges that the sentencing Court may include an order of restitution in an amount greater than that set

forth herein depending upon the proof available at the time of sentencing.

Also in 1995, the IRS levied on proceeds from the sale of paintings that had been consigned to Sotheby's. In March 1995, Blue Lotus instituted a wrongful levy action in the U.S. District Court for the Southern District of New York to recover the proceeds seized by the IRS from the sale of the paintings consigned to Sotheby's. In February 1996, Blue Lotus instituted a wrongful levy action in the U.S. District Court for the Northern District of New York, alleging that Blue Lotus was the rightful owner of the Claverack property. During the course of the district court litigation, D'Aunay represented that he and his brother were the owners of Blue Lotus. D'Aunay also gave misleading testimony about his relationship to petitioner. After the U.S. District Court for the Southern District of New York expressed doubts as to the credibility of D'Aunay, Blue Lotus agreed to dismissal of both wrongful levy suits with prejudice. In relation to dismissal of the litigation in the U.S. District Court for the Northern District of New York, the parties stipulated and the court ordered:

> This dismissal shall operate as an adjudication on the merits that the plaintiff Blue Lotus Holdings Limited, Inc. is the alter ego and nominee of Renee Trupin, a/k/a Renee Virginia Cornelius, a/k/a Renee Daunay.

On February 12, 1999, petitioner filed a Form 8857, Request for Innocent Spouse Relief. The determination that is the basis

of this case was set forth in a Notice of Determination
Concerning Relief From Joint and Several Liability Under Section
6015 dated June 29, 2000. The stated reason for the
determination denying relief was as follows: "You had actual
knowledge or should have known of the tax deficiency items. You
participated in a fraudulent scheme to transfer assets between
spouses. It would not be inequitable to hold you liable
considering all facts and circumstances." Material attached to
the determination explained petitioner's employment by RRI and
Prudential, which led to the conclusion that she had knowledge of
the tax liabilities; her execution of a separation agreement
signed April 15, 1993, acknowledging claims of tax deficiencies
then pending; the liquidation of assets by petitioner and Trupin
through Sotheby's and through Blue Lotus, as petitioner's
nominee; false testimony of petitioner's then husband, D'Aunay;
transfers of assets to Canada and otherwise as a means of placing
the proceeds of sale beyond the reach of collection by the IRS;
conviction of petitioner of "forcible rescue of seized property";
and other conclusions regarding petitioner's lack of credibility.

During the course of discovery in this case, petitioner
refused to answer questions concerning assets that were
transferred to her and/or that petitioner owned since 1980 and
her annual net worth for each year since 1980. She refused to
disclose any residence other than her mother's address in Tulsa,

Oklahoma, that she used for mailings in this case. Petitioner did so despite the Court's admonishment that her failure to respond more fully to respondent's discovery requests could result in sanctions against her. After various hearings and status reports, on December 2, 2002, respondent's motion to impose sanctions for failure to comply with Court-ordered discovery was granted:

> in that petitioner is prohibited from presenting documentary or testimonial evidence in this proceeding, which is the subject matter of respondent's discovery requests, that has not otherwise been provided to respondent as of the date of this Order, * * * relating to the assets that petitioner has owned since 1980 and her annual net worth for each year since 1980.

At the time of trial of this case in June 2003, petitioner refused to answer questions concerning her residence at the time that she filed the petition, her current residence, and property owned by petitioner or her husband, D'Aunay. As a result, and after several warnings by the Court, petitioner did not present any reliable evidence of her current financial situation insofar as that situation is relevant to considerations of equity, as discussed below.

### OPINION

Generally, married taxpayers may elect to file a joint Federal income tax return. Sec. 6013(a). After making the election, each spouse generally is jointly and severally liable for the entire tax due for that taxable year. Sec. 6013(d)(3).

A spouse (requesting spouse) may, however, seek relief from joint and several liability by following procedures established in section 6015.  Sec. 6015(a).  A requesting spouse may request relief from liability under section 6015(b) or, if eligible, may allocate liability according to provisions under section 6015(c).  Sec. 6015(a).  If relief is not available under section 6015(b) or (c), an individual may seek equitable relief under section 6015(f).

Section 6015(b) Analysis

Section 6015(b) provides, in pertinent part, as follows:

SEC. 6015(b).  Procedures For Relief From Liability Applicable to All Joint Filers.--

(1) In general.--Under procedures prescribed by the Secretary, if--

(A) a joint return has been made for a taxable year;

(B) on such return there is an understatement of tax attributable to erroneous items of 1 individual filing the joint return;

(C) the other individual filing the joint return establishes that in signing the return he or she did not know, and had no reason to know, that there was such understatement;

(D) taking into account all the facts and circumstances, it is inequitable to hold the other individual liable for the deficiency in tax for such taxable year attributable to such understatement; * * *

* * * * * * *

> then the other individual shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent such liability is attributable to such understatement.

The requirements of section 6015(b)(1) are stated in the conjunctive. Accordingly, a failure to meet any one of them prevents a requesting spouse from qualifying for the relief offered therein. Alt v. Commissioner, 119 T.C. 306, 313 (2002).

Respondent argues, and we agree, that petitioner has failed to satisfy the requirements of subparagraphs (C) and (D) of section 6015(b)(1). Petitioner was well aware of the business activities of Trupin and was a participant in the expenditure of funds far exceeding any amounts ever reported on a joint tax return with Trupin. Petitioner also knew that she had significant earnings during the years in issue and that no income tax was withheld from her earnings. Petitioner's response is that, although she does not recall specifically what occurred, she may have been shown only the signature page of the tax returns, and told to sign, and the returns were too complicated for her to understand.

Taxpayers seeking to prove that they had no knowledge or reason to know of an item giving rise to an understatement of tax must demonstrate, at a minimum, that they have fulfilled a "duty of inquiry" with respect to determining whether their correct tax liability was reported on the return for the year for which they

seek relief.  Stevens v. Commissioner, 872 F.2d 1499, 1505 (11th Cir. 1989), affg, T.C. Memo. 1988-63; Butler v. Commissioner, 114 T.C. 276, 284 (2000).  When taxpayers fail to fulfill their duty of inquiry, they are ordinarily charged with constructive knowledge of any understatements on their returns.  See Hayman v. Commissioner, 992 F.2d 1256, 1262 (2d Cir. 1993), affg. T.C. Memo. 1992-228; Crowley v. Commissioner, T.C. Memo. 1995-551, affd. without published opinion sub nom. Cockrell v. Commissioner, 116 F.3d 1472 (2d Cir. 1997); Cohen v. Commissioner, T.C. Memo. 1987-537 (the provisions providing relief from joint and several liability are "designed to protect the innocent, not the intentionally ignorant").  Petitioner has not satisfied her burden here.

Moreover, on the entire record of petitioner's enjoyment of the fruits of the consistent pattern of underpayment of taxes and of her subsequent efforts to defeat collection efforts of the IRS, we cannot conclude that it would be inequitable to hold her liable for the deficiencies in tax in issue in this case.  She is not entitled to relief under section 6015(b).

Section 6015(c) Analysis

Section 6015(c) allows a taxpayer, who is eligible and so elects, to limit his or her liability to the portion of a deficiency that is properly allocable to the taxpayer as provided in section 6015(d).  Sec. 6015(c)(1).  Under section

6015(d)(3)(A), generally, any items that give rise to a deficiency on a joint return shall be allocated to the individual filing the return in the same manner as they would have been allocated if the individual had filed a separate return for the taxable year.

Under section 6015(c)(4)(A), the portion of the deficiency for which the electing spouse is liable is increased by the value of any disqualified asset transferred to the taxpayer. The term "disqualified asset" means any property or right to property transferred to the taxpayer making the election under section 6015(c) by the other individual filing the joint return if the principal purpose of the transfer was the avoidance of tax or payment of tax. Sec. 6015(c)(4)(B)(i).

Under section 6015(c)(4)(B)(ii), there is a presumption that any asset transfer that occurs after the date that is 1 year before the first letter of proposed deficiency is sent by the IRS has as its principal purpose the avoidance of tax or payment of tax.

In respondent's posttrial brief, respondent concedes that the entire deficiencies for 1984 through 1986 are allocable to Trupin under section 6015(d)(3)(A). In addition, respondent concedes that $881,103 and $985,314 are allocable to Trupin in 1982 and 1983, respectively. Respondent contends, however, and we agree, that the disallowed losses from petitioner's investment

in ANA 367, as reported on the joint returns for 1982 and 1983 as petitioner's item, are allocable to petitioner.

As to 1984 and 1985, however, respondent argues that the amounts allocable to petitioner should be increased to reflect the tax benefit that petitioner received from items allocated to Trupin to the extent that those items gave rise to a tax benefit for petitioner, i.e., deductions reducing petitioner's earned income. Sec. 6015(d)(3)(B); Hopkins v. Commissioner, 121 T.C. 73, 83-85 (2003). Respondent also traces various assets that were transferred to petitioner by Trupin within the period for which transfers are presumed to have as their principal purpose the avoidance of tax or payment of tax and other transfers that respondent has shown to have as a principal purpose the avoidance of tax or payment of tax.

Petitioner's only response to the detailed analysis in respondent's brief of transfers reflected in the stipulation is that Trupin was repaying loans to her. Petitioner's explanation is unpersuasive. She has stipulated that her net worth as of December 31, 1981, did not exceed $250,000. Because she refused to provide information concerning her assets in response to Court-ordered discovery, she was prohibited from presenting documentary or testimonial evidence relating to the assets that she owned since 1980 or her annual net worth for each year since 1980. All pre-existing debts owed by Trupin to petitioner were

released in the separation agreement executed April 23, 1993.  In any event, under the circumstances, there was no reasonable explanation of the source of funds that petitioner would have used to lend money to Trupin.  We cannot conclude that the amounts that she received from Trupin were repayments of bona fide loans.  The presumption of section 6015(c)(4)(B)(ii), as well as the entire record in this case, leads us to conclude that those transfers made between September 5, 1989, and October 24, 1994, totaling $958,538 were for tax-avoidance purposes and that the portions of the deficiency for which petitioner is liable should be increased by the amount of those transfers.

Respondent also argues that other transfers occurring between January 1, 1986, and September 5, 1989, were made for the avoidance of tax or payment of tax.  To the extent that payments were made with respect to acquisitions of property outside of the United States, we agree with respondent.  Thus, the purchase of real property in Tortola, the formation of Blue Lotus, and the acquisition of Black Lotus, for which Trupin provided a total of $186,500, appear by the preponderance of the evidence to create disqualified assets.

With respect to other transfers, however, the purpose is ambiguous.  For example, respondent asserts that transfers to petitioner and her mother totaling $136,700 between April 21, 1988, and August 7, 1989, the payment of $20,000 toward the

purchase of a Rolls Royce in 1987, and $11,706 in proceeds from sales of collectibles through Sotheby's should also be treated as transfers for the purpose of avoiding tax. We are unwilling, however, to carry the inference to all transfers to petitioner by Trupin during the period of their marriage. We are not persuaded that the items listed in this paragraph increase petitioner's liability under section 6015(c)(4)(A).

Respondent also argues that petitioner is disqualified from relief under section 6015(c)(3)(C) to the extent that she had actual knowledge of the facts concerning disallowed deductions for 1982 and omitted income for all of the years in issue. Respondent acknowledges the burden to prove actual knowledge by a preponderance of the evidence on this issue. Culver v. Commissioner, 116 T.C. 189, 196 (2001); see Cheshire v. Commissioner, 115 T.C. 183, 196-197 (2000), affd. 282 F.3d 326 (5th Cir. 2002).

Petitioner was actively involved in RRI's tax shelter business as an employee and as an officer and was well aware of the investments giving rise to the disallowed deductions for 1982. See Crowley v. Commissioner, T.C. Memo. 1995-551. With respect to the unreported income from constructive dividends during the later years, petitioner was well aware that she and Trupin used the yacht for personal purposes, that the yacht was owned by a corporation owned or controlled by Trupin, and that

the corporation was not reimbursed for personal use of the yacht. To the extent of these items, therefore, respondent has proven that petitioner had actual knowledge disqualifying her from relief under section 6015(c).

Aside from her overall denials and disclaimers, petitioner has given us no reason to reject respondent's allocations of amounts for which petitioner is not entitled to relief under section 6015(c). Except as set forth above with respect to transfers before September 5, 1989, she is not entitled to relief beyond the concessions made by respondent in the posttrial brief.

Section 6015(f) Analysis

Section 6015(f) provides an additional opportunity for relief to those taxpayers who do not otherwise meet the requirements of subsection (b) or (c) of section 6015. Specifically, section 6015(f) gives respondent the discretion to grant equitable relief from joint and several liability if "taking into account all the facts and circumstances, it is inequitable to hold the individual liable for any unpaid tax".

We have jurisdiction to review respondent's denial of petitioner's request for equitable relief under section 6015(f). Jonson v. Commissioner, 118 T.C. 106, 125 (2002), affd. 353 F.3d 1181 (10th Cir. 2003); Butler v. Commissioner, 114 T.C. at 292. We review such denial of relief to decide whether respondent abused his discretion by acting arbitrarily, capriciously, or without sound basis in fact. Jonson v. Commissioner, supra at

125; <u>Butler v. Commissioner</u>, <u>supra</u> at 292. The review of respondent's denial of petitioner's request for relief under section 6015(f) is a question of fact. <u>Cheshire v. Commissioner</u>, <u>supra</u> at 198. Petitioner bears the burden of proving that respondent abused his discretion. <u>Washington v. Commissioner</u>, 120 T.C. 137, 146 (2003); see also <u>Alt v. Commissioner</u>, 119 T.C. at 311 ("Except as otherwise provided in section 6015, petitioner bears the burden of proof."); <u>Jonson v. Commissioner</u>, <u>supra</u> at 113 (same).

As directed by section 6015(f), respondent has prescribed procedures to use in determining whether a relief-seeking spouse qualifies for relief under section 6015(f). At the time that petitioner filed her petition in this case, those procedures were found in Rev. Proc. 2000-15, 2000-1 C.B. 447. Rev. Proc. 2000-15, sec. 4.01, 2000-1 C.B. at 448, lists seven threshold conditions that must be satisfied before respondent will consider a request for relief under section 6015(f). The threshold conditions include the following:

> (5) No assets were transferred between the spouses filing the joint return as part of a fraudulent scheme by such spouses;

> (6) There were no disqualified assets transferred to the requesting spouse by the nonrequesting spouse. If there were disqualified assets transferred to the requesting spouse by the nonrequesting spouse, relief will be available only to the extent that the liability exceeds the value of such disqualified assets. For this purpose, the term "disqualified asset" has the meaning given such term by section 6015(c)(4)(B);  * * *

Id.  A requesting spouse must satisfy all seven threshold conditions before respondent will consider his or her request for equitable relief under section 6015(f).  Id.  We have upheld the use of these procedures in reviewing a negative determination. See Washington v. Commissioner, supra at 147; Jonson v. Commissioner, supra at 125.

As indicated above with reference to section 6015(b), considering the facts and circumstances in this case, we cannot conclude that it would be inequitable to hold petitioner liable for the deficiencies resulting from her filing joint returns with Trupin for the years in issue.  A fortiori, we cannot conclude that denial of relief was an abuse of discretion, i.e., arbitrary, capricious, or without sound basis in fact.  See Ewing v. Commissioner, 122 T.C. 32, 39 (2004).

Petitioner's predicament has resulted from the activities in which she engaged with her former husband, Trupin, exacerbated by her activities with her husband, D'Aunay.

(It may occur to the reader that petitioner could or should make an offer in compromise under section 7122.  Her refusal to provide financial information to the IRS, however, also precludes that avenue of relief.)

To take account of respondent's concessions of the extent to which petitioner may be relieved from liability under section 6015(c),

Decision will be entered
under Rule 155.