T.C. Memo. 2001-21


UNITED STATES TAX COURT



JULIAN O. VON KALINOWSKI AND PENELOPE J. VON KALINOWSKI,
Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 46200-86.                    Filed January 30, 2001.


Philip R. Linsley, for petitioners.

David R. Jojola, for respondent.



MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, Judge:  For 1981 and 1982, respondent determined deficiencies in petitioners' Federal income taxes and additions to tax as follows:

|  |  | Additions to Tax | |
| Year | Deficiency | Sec. 6653(a)(1) | Sec. 6653(a)(2) |
| 1981 | $182,296 | $9,114.80 | [1] |
| 1982 | 81,495 | 4,074.75 | [1] |

[1] 50 percent of interest due on the deficiency for the relevant year.

After concessions,[1] the sole issue for decision is whether petitioner wife is entitled to relief from joint and several liability under section 6015(b)(1).[2]

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. References to petitioner in the singular are to Penelope J. Von Kalinowski.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. At the time they filed their petition with the Court, petitioners were residents of Los Angeles, California.

Petitioners jointly filed a Form 1040, U.S. Individual Income Tax Return, for each of the taxable years at issue. With respect to taxable year 1981, petitioners twice filed an amended

---

[1] Without considering the application of the relief provisions of sec. 6015 to petitioner Penelope J. Von Kalinowski, petitioners concede deficiencies of $179,230 and $81,495 for tax years 1981 and 1982, respectively. Respondent concedes the additions to tax under sec. 6653(a)(1) and (a)(2).

[2] Sec. 6015 was added by sec. 3201(a) of the Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, 112 Stat. 734. Sec. 6015 is effective with respect to any tax liability arising after July 22, 1998, and any tax liability arising on or before July 22, 1998, that is unpaid on that date.

return. On their 1982 return, petitioners claimed an investment tax credit in excess of their income tax liability. Petitioners accordingly filed joint and separate Forms 1045, Application for Tentative Refund, in order to apply the excess credit against their tax liabilities from prior years.[3]

Background

Petitioner was born and educated in the United Kingdom. She graduated from the London College of Secretaries in 1967, and she attended Saint Thomas College from 1975 to 1976. During her studies at Saint Thomas College, petitioner completed a one semester course in financial accounting.

From 1972 until 1978, petitioner was employed by Pfizer Corp. (Pfizer) to coordinate the provision of secretarial and administrative services to a team of lawyers that represented the company in ongoing antitrust litigation.[4] While working at Pfizer, petitioner met her future husband, Julian O. Von Kalinowski. An experienced attorney with the firm of Gibson, Dunn and Crutcher, L.L.P., Mr. Von Kalinowski led the team of attorneys for whom petitioner provided administrative support.

---

[3] In addition to jointly filing Form 1045 seeking a carryback of the excess investment credit to 1980, petitioners separately filed Forms 1045 seeking a carryback of the excess investment credit to 1979 (a tax year which preceded petitioners' marriage).

[4] Petitioner's accounting responsibilities at Pfizer consisted of limited bookkeeping, which was mostly handled by a secretary on her behalf.

Mr. Von Kalinowski specialized in the fields of antitrust law and complex litigation, and over the years he has authored legal treatises on these subjects. From 1972 to 1973, Mr. Von Kalinowski served as chairman of the antitrust section of the American Bar Association.

Petitioner moved in with Mr. Von Kalinowski in October of 1979, and the couple married on June 29, 1980.[5] At the time of their marriage, petitioner was 32 years of age and Mr. Von Kalinowski was 64 years of age. Petitioners remained married at the time of trial.

Standard of Living

Both prior to and following the couple's marriage, Mr. Von Kalinowski maintained petitioner in what can be reasonably described as an affluent lifestyle. Throughout their marriage, the couple has resided in a townhouse located in Los Angeles, California (the residence), which Mr. Von Kalinowski purchased in 1979 for $342,290. At all relevant times, Mr. Von Kalinowski maintained a membership at the Los Angeles Country Club. Mr. Von Kalinowski also made a number of gifts to petitioner around the time of their marriage. He allowed petitioner to use one of his vehicles until he purchased a new BMW automobile for her in 1980.

---

[5] Petitioners did not enter into an antenuptial agreement, nor have they entered into any post-nuptial agreements concerning their property.

Mr. Von Kalinowski gave petitioner an engagement ring and wedding band in conjunction with their marriage, and shortly thereafter, he bought her a fur coat costing approximately $4,000. Petitioners took a number of trips from 1980 to 1983, yet virtually all of them were related to Mr. Von Kalinowski's profession. The lone exception was a safari vacation to Kenya which the couple took in either 1982 or 1983.

Petitioner's Business Endeavors

Around the time of the couple's marriage, Mr. Von Kalinowski expressed his desire that petitioner not work outside of the home in order that she could accompany him on his extensive business travels and assist him with his social responsibilities. The couple later discussed the possibility of petitioner's starting her own business in order to accommodate petitioner's desire to work in a manner that would allow her to maintain autonomy over her schedule.

In 1980, petitioner started Peter Dyer Interiors, a business through which petitioner imported oil paintings for resale and provided interior design services. Peter Dyer Interiors was operational during 1981 and 1982, and generated net operating losses of $4,322 and $9,740 during those years, respectively.

During 1983, petitioner took courses to become a travel agent. In 1984, she and a faculty member of the school she attended started a travel agency known as Windsor Travel.

Petitioner and Mr. Von Kalinowski borrowed the funds for petitioner's share of the startup costs. In 1985, petitioner and Mr. Von Kalinowski bought out petitioner's co-owner in the travel agency for approximately $25,000.

Windsor Travel was operational from 1984 to 1999. Over this time period, Mr. Von Kalinowski invested over $500,000 in the business on behalf of petitioner, and such amounts were used to fund the operations of the agency. In 1999, petitioner sold the assets of Windsor Travel for approximately $25,000 plus a sliding percentage of revenue generated from the transferred accounts.

Financial Matters

Petitioner and her husband maintained two bank accounts. While each of these accounts was titled in the couple's joint names, the couple regarded one as petitioner's checking account and the other as Mr. Von Kalinowski's checking account. Petitioner used the funds in her checking account to pay the couple's grocery bills and other personal expenses, and Mr. Von Kalinowski made periodic deposits into this account for such purposes. The bank statements on petitioner's checking account were sent to the couple's residence and received by petitioner.

The bank statements on Mr. Von Kalinowski's checking account were sent to his office and received by his secretary, Gina Hester. Ms. Hester served as Mr. Von Kalinowski's personal secretary from 1952 until just prior to his retirement in 1985,

and she was responsible for handling Mr. Von Kalinowski's everyday financial affairs.  For instance, Ms. Hester received and deposited Mr. Von Kalinowski's paychecks, she paid all routine expenses such as insurance payments, mortgage payments, and she made the payments due on Mr. Von Kalinowski's outstanding loans.

Given the responsibilities undertaken by Ms. Hester, petitioner's knowledge of the particulars of her husband's finances was limited.  Petitioner, however, was aware that Mr. Von Kalinowski made investment decisions on their joint behalf, and she allowed him to do so without seeking her approval.

Husband's Tax Shelter Investments

Respondent determined the deficiencies for the years at issue based on the distributive shares of the following partnerships:  Diversified Investments Group (Diversified), Capricorn Company (Capricorn), and Pisces Company (Pisces) (collectively, the tax shelter investments).  Mr. Von Kalinowski invested approximately $10,000 in Diversified upon the suggestion of a law partner and following a meeting with Diversified's promoter.  Mr. Von Kalinowski did not consult petitioner with respect to this investment.

Mr. Von Kalinowski became interested in Capricorn and Pisces (the partnerships) when another law partner introduced him to an individual named Togo Tanaka.  In addition to being a member of

the local Rotary club, Mr. Tanaka was represented to be a member of the board of governors of the Federal Reserve Bank of San Francisco. Mr. Tanaka in turn introduced Mr. Von Kalinowski to Philip Siriani, a businessman who had contacts with a local bank willing to finance the investment in the partnerships. Mr. Tanaka's position in the community and Mr. Siriani's apparent business and political contacts supplied a measure of credence to the financial benefits and tax advantages purportedly offered by the partnerships. Mr. Von Kalinowski was further assured of the partnerships' legitimacy when informed that a former U.S. senator was also investing.[6]

Near the end of 1981, Mr. Von Kalinowski purchased limited partnership interests in the partnerships. He financed the investment through a $140,000 bank loan secured by the couple's residence. Although the residence was titled in Mr. Von Kalinowski's individual name and constituted his separate property, both Mr. Von Kalinowski and petitioner executed the deed of trust in favor of the bank.[7]

Petitioner had limited, if any, knowledge of her husband's

---

[6] Former U.S. Senator S.I. Hayakawa is listed as a limited partner on Capricorn's certificate of limited partnership.

[7] Presumably, the bank required petitioner's signature on the deed of trust to protect its security interest from any spousal claims which petitioner may have had against the property under California property law.

investments in the tax shelter investments.  Not only did Mr. Von
Kalinowski not consult petitioner prior to investing, he did not
discuss the investments with her during the tax years at issue.
The Schedules K-1, Partner's Share of Income, Credits, Deduction,
etc., issued by the partnerships to Mr. Von Kalinowski were sent
to his home address.  It was petitioner's general practice,
however, not to open mail addressed to her husband.   Upon
receipt, Mr. Von Kalinowski would forward the Schedules K-1 to
his accountant.

Preparation of Income Tax Returns

The tax returns for the years at issue were prepared by
Stanley Breitbard, a certified public accountant with the firm of
Price Waterhouse.  As a means of compiling the information
necessary to prepare the couple's return, Price Waterhouse sent
various informational schedules to Mr. Von Kalinowski for
completion.  These schedules were completed by Ms. Hester on Mr.
Von Kalinowski's behalf.[8]  Petitioner compiled the tax
information relating to her sole proprietorship and forwarded
such information to the accountant.

After the return was completed, either Mr. Breitbard or
someone from his office would review it with Mr. Von Kalinowski.
Mr. Von Kalinowski would then take the return home for
petitioner's signature.  Petitioner consistently executed the

---

[8]  Mr. Von Kalinowski's business address was used for each
of the returns at issue because the couple's tax records were
maintained there.

returns at issue without reviewing their contents.  At no point did petitioner request an explanation of the returns prior to signing them.

Each of the returns at issue was signed by Mr. Breitbard on behalf of Price Waterhouse as the paid preparer.  Mr. Breitbard did not highlight for Mr. Von Kalinowski any potential problems with respect to the tax benefits claimed from the tax shelter investments, and Mr. Von Kalinowski believed the returns to be correctly prepared when he signed them.

Contents of Tax Returns

Mr. Von Kalinowski's distributive share of income from his law firm for the 1981 and 1982 taxable years was $391,474 and $291,348, respectively.  In addition, the legal treatises which Mr. Von Kalinowski authored generated gross income of $65,171 and $78,915 for the 1981 and 1982 tax years, respectively.

The tax shelter investments generated combined losses of $368,675 for the 1981 tax year.  For the 1982 tax year, the combined partnership losses were $228,133.  Furthermore, in 1982 the tax shelter investments generated an investment income tax credit of $13,616 with respect to which petitioners filed the Forms 1045.

Petitioners' Current Financial Status

Throughout the term of their marriage, petitioners have utilized income received by Mr. Von Kalinowski for their joint

support.  Mr. Von Kalinowski retired from his law firm in 1985 at the age of 68.  During the years 1995 through 1999, his retirement income from the firm averaged $280,000.  During this same time period, Mr. Von Kalinowski's royalty income derived from his legal treatises averaged $147,000 annually.  Lastly, Mr. Von Kalinowski receives an annual pension from the Naval Reserve of $17,138.[9]

Petitioner is currently employed as the executive vice president of the Museum of Flying in charge of development.  Her annual salary is $70,000.

Mr. Von Kalinowski maintains a $1 million life insurance policy of which petitioner is the designated beneficiary.  While Mr. Von Kalinowski's pension income from the law firm terminates upon his death, his royalty income from the treatises continues at 60 percent of its current rate for a period of 15 years following his death.  Petitioner is the beneficiary of such royalty income.

OPINION

A.    Statutory Background

Section 6013(a) provides that spouses may elect to file a

---

[9]  Part of Mr. Von Kalinowski's income must be applied toward alimony obligations in favor of his first wife.  During 1999, Mr. Von Kalinowski paid alimony in the amount of $47,577. He is currently obligated to pay his ex-wife $3,233 per month, plus one-half of his pension from the Naval Reserve.

joint Federal income tax return.  If a husband and wife file a joint return, the tax is computed on their aggregate income and the liability with respect to such tax is joint and several.  See sec. 6013(d)(3).  Section 6015, however, provides various means by which a spouse can be relieved of this joint and several obligation.  Petitioner makes her claim for such relief pursuant to section 6015(b)(1).

To qualify for statutory relief from joint and several liability under section 6015(b)(1), a taxpayer must establish that:  (1) A joint return was made under section 6013, see sec. 6015(b)(1)(A); (2) there was an understatement of tax attributable to erroneous items of the other spouse, see sec. 6015(b)(1)(B); (3) at the time of signing the return, the spouse seeking relief did not know and had no reason to know of such understatement, see sec. 6015(b)(1)(C); and (4) taking into account all the facts and circumstances, it is inequitable to hold the spouse seeking relief liable for the deficiency in tax attributable to the understatement, see sec. 6015(b)(1)(D).[10]

The requirements of section 6015(b)(1) are stated in the conjunctive.  Accordingly, a failure to meet any one of them prevents a spouse from qualifying for the relief offered therein.

---

[10]  As a procedural matter, a spouse seeking relief under sec. 6015(b) must also submit the claim for relief within 2 years of the date on which the Secretary begins collection activities with respect to such spouse.  See sec. 6015(b)(1)(E).

We have found that petitioners filed a joint return for each of the years in issue, and respondent concedes that there was an understatement of tax attributable to Mr. Von Kalinowski. Accordingly, we shall address whether petitioner lacked actual and constructive knowledge of the understatements as required by section 6015(b)(1)(C) as well as whether it is inequitable to hold petitioner liable for the understatements as required by section 6015(b)(1)(D).  Petitioner carries the burden of proof as to each of these elements.  See Rule 142(a).

B.    Relation Between Sec. 6015(b)(1) and Former Sec. 6013(e)

Before delving into the particulars of section 6015(b)(1), we pause to note its relation to former section 6013(e).  In 1971, Congress enacted section 6013(e) in order to correct perceived grave injustices resulting from the imposition of joint and several liability.  See S. Rept. 91-1537, at 2 (1970), 1971-1 C.B. 606, 607; see also Act of Jan. 12, 1971, Pub. L. 91-679, sec. 1, 84 Stat. 2063 (enacting sec. 6013(e)), as amended by the Deficit Reduction Act of 1984, Pub. L. 98-369, sec. 424, 98 Stat. 494, 801.  Section 6013(e), as amended, provided that a spouse could be relieved of joint and several liability if the spouse proved that:  (1) A joint income tax return was filed; (2) the return contained a substantial understatement of tax attributable to grossly erroneous items of the other spouse; (3) in signing the return, the relief-seeking spouse did not know, and had no

reason to know, of the substantial understatement; and (4) under the circumstances it is inequitable to hold the relief-seeking spouse liable for the substantial understatement.

For many taxpayers, relief under section 6013(e) was difficult to obtain.  In order to make such relief more accessible, Congress repealed section 6013(e) and enacted a new provision (section 6015) in 1998 as part of the Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, sec. 3201(a), 112 Stat. 734.  See H. Conf. Rept. 105-599, at 249 (1998).  The newly enacted section provides three avenues of relief, one of which is section 6015(b)(1).  See Cheshire v. Commissioner, 115 T.C. 183, 189 (2000).  While section 6015(b)(1) is a modified version of former section 6013(e), none of the differences are relevant to the present litigation.  Accordingly, in analyzing the provisions of section 6015(b)(1) in the present context, we shall make use of case law interpreting identical provisions under former section 6013(e).  See Butler v. Commissioner, 114 T.C. 276, 283 (2000) (noting that cases interpreting former section 6013(e) remain instructive as to the analysis of whether a taxpayer knew or had reason to know of an understatement pursuant to section 6015(b)).

C.   Actual or Constructive Knowledge--Sec. 6015(b)(1)(C)

Pursuant to section 6015(b)(1)(C), petitioner must establish that she did not know and further had no reason to know of the

understatement in tax on the joint returns which she filed with her husband.  In the context of an understatement resulting from deductions claimed in error, the United States Court of Appeals for the Ninth Circuit (the circuit where an appeal of this decision would lie) interpreted this requirement as follows:  "It requires a spouse seeking relief to establish that she did not know and did not have reason to know that the deduction would give rise to a substantial understatement."  Price v. Commissioner, 887 F.2d 959, 963 (9th Cir. 1989), revg. an oral opinion of this Court; see also Hayman v. Commissioner, 992 F.2d 1256, 1261 (2d Cir. 1993), affg. T.C. Memo. 1992-228; Stevens v. Commissioner, 872 F.2d 1499, 1505 (11th Cir. 1989), affg. T.C. Memo. 1988-63.

We are satisfied that petitioner lacked actual knowledge of the understatement.  We therefore turn to whether petitioner had reason to know of the understatement.

A spouse has "reason to know" of the understatement if a reasonably prudent taxpayer in his or her position at the time of signing the return could be expected to know that the return contained the understatement.  Price v. Commissioner, supra at 965.  Factors to be considered in determining whether the spouse had reason to know of the understatement include:  (1) The spouse's level of education; (2) the spouse's involvement in the family's business and financial affairs; (3) the presence of

expenditures that appear lavish or unusual when compared to the family's past levels of income, standard of living, and spending patterns; and (4) the culpable spouse's evasiveness and deceit concerning the couple's finances. See Hayman v. Commissioner, supra at 1261; Price v. Commissioner, supra at 965.

1.  Facts Supporting a Finding that Petitioner Lacked Constructive Knowledge of Understatement

On one hand, certain of the above-mentioned factors indicate that petitioner did not have reason to know of the understatement of tax contained in the couple's 1981 and 1982 tax returns. First, petitioner had no role in the couple's finances beyond making payments for household expenses. All other matters were the responsibility of her income-producing counterpart, a responsibility which he in turn delegated to his personal secretary. While Mr. Von Kalinowski did not seek to hide any financial information from petitioner, the two simply did not discuss such matters beyond mere generalities. In keeping with this general practice, petitioner was at no time aware of her husband's participation in the tax shelter investments.

Second, as reflected in the findings of fact, petitioners maintained a reasonably affluent lifestyle both prior to their marriage and during the years which followed. Petitioner testified that she did not experience a change of lifestyle during the tax years at issue, and we find her testimony credible in this regard. We are satisfied that nothing about petitioners'

standard of living or spending habits would have alerted her to the fact that her and her husband's tax obligations were not being accurately reported.

2. Facts Supporting a Finding That Petitioner Possessed Constructive Knowledge of Understatement

While certain considerations in this case support a finding that petitioner lacked constructive knowledge of the understatement, others support a contrary conclusion. Petitioner is not unsophisticated in financial matters. She is an educated woman, and her studies included a course in financial accounting. Petitioner worked for a number of years prior to her marriage, presumably receiving paychecks, paying bills, and filing income tax returns. Furthermore, during the tax years at issue, petitioner ran her own sole proprietorship. Although not a large enterprise, petitioner's experience was certainly sufficient to provide her an understanding of what it meant for a business to incur a profit or a loss. With respect to her business, petitioner prepared the tax information necessary to be included on the tax return.

3. Duty of Inquiry

The facts supporting a conclusion that petitioner possessed constructive knowledge of the understatement become increasingly persuasive in light of the information that was included on the tax returns which petitioner executed. Although petitioner did not review the returns prior to signing them, she is charged with

knowledge of their contents.  See Hayman v. Commissioner, supra at 1262; Terzian v. Commissioner, 72 T.C. 1164, 1170 (1979). Petitioner is thus deemed to have known that, in 1981, the tax shelter investments resulted in losses totaling $368,675 compared to her husband's law firm and royalty income of $456,645. Similarly, petitioner is charged with knowledge that her husband's 1982 income from such sources of $370,263 was offset by tax shelter losses of $228,133.  "Tax returns setting forth large deductions, such as tax shelter losses offsetting income from other sources and substantially reducing * * * the couple's tax liability, generally put a taxpayer on notice that there may be an understatement of tax liability."  Hayman v. Commissioner, supra at 1262; see also Levin v. Commissioner, T.C. Memo. 1987-67.  We find that the size of the losses claimed on the return should have alerted petitioner to question their legitimacy.[11]

Where a spouse has a duty to inquire as to the legitimacy of a deduction, the failure to satisfy such duty may result in constructive knowledge of the understatement being imputed to her.  See Price v. Commissioner, 887 F.2d at 965; see also Levin v. Commissioner, supra.  A spouse cannot obtain relief from joint

---

[11]  The investment tax credits generated by the tax shelter investments and carried back by petitioners to prior tax years (including years prior to their marriage) with respect to which petitioners filed joint and separate Forms 1045 would seemingly have provided petitioner with an additional justification to seek more information regarding the investments.

liability in a deduction case "'by simply turning a blind eye to--by preferring not to know of--facts fully disclosed on a return, of such a large nature as would reasonably put such spouse on notice that further inquiry would need to be made'". Price v. Commissioner, supra at 965 (quoting Levin v. Commissioner, T.C. Memo. 1987-67). Petitioner made no inquiry as to the validity of the deductions. Her duty of inquiry thus went unfulfilled. Accordingly, we hold that petitioner possessed constructive knowledge of the understatement for purposes of section 6015(b)(1)(C).

D.   The Equities--Sec. 6015(b)(1)(D)

Even had petitioner satisfied the knowledge requirement under section 6015(b)(1)(C), she would have failed to qualify for relief from joint and several liability by reason of section 6015(b)(1)(D). Pursuant to section 6015(b)(1)(D), a spouse seeking relief under section 6015(b)(1) must establish that it is inequitable to hold him or her liable for the deficiency attributable to the understatement. This determination must be made based upon due consideration of all the facts and circumstances. See sec. 1.6013-5(b), Income Tax Regs. For reasons discussed below, we find that the imposition of joint and several liability in this case is not inequitable.

Petitioner's principal argument regarding the equities in this case is grounded in the possibility that her husband will

not satisfy the conceded deficiencies. Petitioner notes that "Although [Mr. Von Kalinowski] may have the income and assets to pay the liability there is no assurance that he will do so." From this, petitioner concludes that she will suffer "substantial future hardship" if she is not relieved of the liability. The hardship which petitioner describes is contingent upon (a) Mr. Von Kalinowski's not satisfying the deficiencies during his lifetime, and (b) Mr. Von Kalinowski's passing away and disinheriting petitioner. We do not believe that this hypothetical hardship is sufficient to satisfy the requirements of section 6015(b)(1)(D). Rather, the statute requires that the taxpayer demonstrate that the imposition of joint and several liability is inequitable in present terms.

As things presently stand, petitioner and Mr. Von Kalinowski remain married. The two have not separated, and petitioner has not been left by her husband to "face the music". Instead, petitioner continues to enjoy the lifestyle and financial security that are largely attributable to her husband's assets and income. Simply put, petitioner has not been deserted in the sense foreseen by the legislators who enacted the predecessor to the section 6015(b)(1) relief from joint liability. See Hayman v. Commissioner, 992 F.2d at 1263; Meyer v. Commissioner, T.C. Memo. 1996-400; Prince v. Commissioner, T.C. Memo. 1995-368.

Petitioner also contends that she did not significantly

benefit from the tax savings generated by the understatement. Whether the relief-seeking spouse has significantly benefited from the understatement in tax is a factor to be considered in weighing the equities. See sec. 1.6013-5(b), Income Tax Regs. Transfers of property to the relief-seeking spouse are relevant in determining the existence of a significant benefit, and such transfers are not limited to the tax years to which the understatement relates. See id. Mr. Von Kalinowski testified that he contributed approximately $500,000 to petitioner's travel agency over the course of the 15-year period in which the business was operational. These contributions were of obvious benefit to petitioner, and the amount of such transfers renders petitioner's argument that she did not significantly benefit from the tax savings unpersuasive.

Finally, a factor which may be taken into account in weighing the equities is whether the failure to report the correct tax liability in this case resulted from concealment, overreaching, or other wrongdoing on the part of the spouse not seeking relief. See Hayman v. Commissioner, supra at 1262; McCoy v. Commissioner, 57 T.C. 732, 735 (1972). No such untoward circumstances are present in this case. Rather, the understatement in tax is attributable to a mistaken belief on the part of Mr. Von Kalinowski as well as his accountant as to the legitimacy of the tax shelter deductions. Under these circumstances, we perceive no inequity in holding both spouses to

joint and several liability. See <u>Bokum v. Commissioner</u>, 992 F.2d 1132, 1135 (11th Cir. 1993), affg. 94 T.C. 126 (1990); <u>McCoy v. Commissioner</u>, <u>supra</u> at 735.

E.   <u>Conclusion</u>

Petitioner is not entitled to relief from joint and several liability pursuant to section 6015(b)(1) as she has failed to satisfy the requirements of section 6015(b)(1)(C) and (D).

To reflect the stipulations of settled issues and our determination herein,

<u>Decision will be entered</u>

<u>under Rule 155</u>.