T.C. Memo. 2004-266


UNITED STATES TAX COURT



DONALD J. BARNES AND BEVERLY A. EDWARDS,
f.k.a. BEVERLY A. BARNES, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 6182-96.            Filed November 22, 2004.


    Wendy S. Pearson, Terri A. Merriam, and Jennifer A. Gellner,

for petitioner Beverly A. Edwards.

    Thomas M. Rohall, for respondent.



        MEMORANDUM FINDINGS OF FACT AND OPINION


    DAWSON, Judge:  This case was assigned to Special Trial

Judge Stanley J. Goldberg pursuant to the provisions of section

7443A(b)(4), in effect at the time the petition was filed in this

case, and Rules 180, 181, and 183.[1]  The Court agrees with and
adopts the opinion of the Special Trial Judge, as set forth
below.

OPINION OF THE SPECIAL TRIAL JUDGE

GOLDBERG, Special Trial Judge:  Respondent determined the
following deficiencies in petitioners' Federal income taxes and
additions to tax for the respective taxable years:

| | | Additions to Tax | | | |
|---|---|---|---|---|---|
| Year | Deficiency | Sec. 6653(a)[1] | Sec. 6653(a)(1)[2] | Sec. 6653(a)(2)[2] | Sec. 6659 |
| 1978 | $3,834 | $192 | n/a | n/a | $1,150 |
| 1979 | 4,420 | 221 | n/a | n/a | 1,326 |
| 1980 | 6,024 | 301 | n/a | n/a | 1,807 |
| 1981 | 8,143 | n/a | $407 | [3] | 2,443 |

[1]As in effect for petitioners' taxable years 1978, 1979, and 1980.
[2]As in effect for petitioners' taxable year 1981.
[3]50 percent of the interest due on the deficiency of $8,143.

Respondent further determined that the entire amount of the
deficiency for each year is subject to the increased rate of
interest charged on "substantial underpayments attributable to
tax motivated transactions" under section 6621(c)[2].

[1]Unless otherwise indicated, section references are to the
Internal Revenue Code in effect during the years in issue, and
all Rule references are to the Tax Court Rules of Practice and
Procedure.

[2]References to sec. 6621(c) are to sec. 6621(c) as in effect
with respect to interest accruing after Dec. 31, 1986.  See Tax
Reform Act of 1986 (TRA 1986), Pub. L. 99-514, sec. 1511(d), 100
Stat. 2746.  For interest accruing before that date, but after
Dec. 31, 1984, a nearly identical provision was codified at sec.
(continued...)

In their petition, petitioners dispute all of the determinations made by respondent in the notice of deficiency, and petitioners further argue that the statute of limitations bars the assessment and collection of the taxes for each of the years. Petitioner Donald J. Barnes (Mr. Barnes) and respondent have settled all of the issues in this case as they pertain to Mr. Barnes and have filed a stipulation of settled issues. Petitioner Beverly A. Edwards (petitioner) has conceded that (1) the adjustments in the notice of deficiency underlying the amounts of the deficiencies are correct; (2) the statute of limitations does not bar the assessment and collection of the taxes in this case; and (3) petitioner is not entitled to a deduction for a theft loss as asserted in the Second Amendment to Petition. In the first Amendment to Petition, petitioner alleges that she is entitled to relief from joint liability pursuant to section 6015(b), (c), or (f), relief which respondent denied on or about February 27, 2003.[3] Thus, the remaining issues for

---

[2](...continued)
6621(d). See TRA 1986 sec. 1511(c)(1)(A), 100 Stat. 2744; Deficit Reduction Act of 1984, Pub. L. 98-369, sec. 144(a), (c), 98 Stat. 682, 684. Sec. 6621(c) was repealed in 1989 with respect to returns due after Dec. 31, 1989. Omnibus Budget Reconciliation Act of 1989 (OBRA 1989), Pub. L. 101-239, sec. 7721(b), (d), 103 Stat. 2399, 2400.

[3]Respondent treated petitioner's first Amendment to Petition as petitioner's request for relief under sec. 6015, and respondent's Appeals Office subsequently denied petitioner relief.

decision in this case are, with respect to petitioner alone: (1) Whether petitioner is liable for the section 6653 addition to tax for negligence in each year in issue; (2) whether petitioner is liable for the section 6659 addition to tax for valuation overstatements in each year; (3) whether petitioner is liable for the increased rate of interest under section 6621(c) that is applied with respect to tax motivated transactions; and (4) whether petitioner is entitled to relief from joint and several liability pursuant to section 6015.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The first, second, third, and fourth stipulation of facts and the attached exhibits are incorporated herein by this reference. Petitioner resided in Placerville, California, on the date the petition was filed in this case.

## I. Walter J. Hoyt, III and River City Ranches #1

The parties stipulated certain facts for purposes of this case that provide a background for the partnership items on petitioner's return, facts that concern Walter J. Hoyt, III (Mr. Hoyt) and the partnership River City Ranches, also known as River City Ranches #1 (RCR #1). The following is a summary of a portion of the stipulated facts that are supported by the record:

Mr. Hoyt's father was a prominent breeder of Shorthorn cattle, one of the three major breeds of cattle in the United

States.  In order to expand his business and attract investors, Mr. Hoyt's father had started organizing and promoting cattle breeding partnerships by the late 1960s.  Before and after his father's death in early 1972, Mr. Hoyt and other members of the Hoyt family were extensively involved in organizing and operating numerous cattle breeding partnerships.  From about 1971 through 1998, Mr. Hoyt organized, promoted to thousands of investors, and operated as a general partner more than 100 cattle breeding partnerships.  Mr. Hoyt also organized and operated sheep breeding partnerships in essentially the same fashion as the cattle breeding partnerships (collectively the "investor partnerships").  Each of the investor partnerships was marketed and promoted in the same manner.

Beginning in 1983, and until removed by this Court due to a criminal conviction, Mr. Hoyt was the tax matters partner of each of the investor partnerships that are subject to the provisions of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. 97-248, 96 Stat. 324.  As the general partner managing each partnership, Mr. Hoyt was responsible for and directed the preparation of the tax returns of each partnership, and he typically signed and filed each return.  Mr. Hoyt also operated tax return preparation companies, variously called "Tax Office of W.J. Hoyt Sons", "Agri-Tax", and "Laguna Tax Service", that prepared most of the investors' individual tax returns during the

years of their investments.  Petitioner's 1981 return, on which the deduction and credits appeared that underlie the deficiency in each year in issue in this case, was prepared and signed by Mr. Hoyt.  From approximately 1980 through 1997, Mr. Hoyt was a licensed enrolled agent, and as such he represented many of the investor-partners before the Internal Revenue Service (IRS) before he was disbarred as enrolled agent in 1998.

Beginning in February 1993, respondent generally froze and stopped issuing income tax refunds to partners in the investor partnerships.  The IRS issued prefiling notices to the investor-partners advising them that, starting with the 1992 taxable year, the IRS would disallow the tax benefits that the partners claimed on their individual returns from the investor partnerships, and the IRS would not issue any tax refunds these partners might claim attributable to such partnership tax benefits.

Also beginning in February 1993, an increasing number of investor-partners were becoming disgruntled with Mr. Hoyt and the Hoyt organization.  Many partners stopped making their partnership payments and withdrew from their partnerships, due in part to respondent's tax enforcement.  Mr. Hoyt urged the partners to support and remain loyal to the organization in challenging the IRS's actions.  The Hoyt organization warned that partners who stopped making their partnership payments and withdrew from their partnerships would be reported to the IRS as

having substantial debt relief income, and that they would have to deal with the IRS on their own.

On June 5, 1997, a bankruptcy court entered an order for relief, in effect finding that W.J. Hoyt Sons Management Company and W.J. Hoyt Sons MLP were both bankrupt. In these bankruptcy cases, the United States Trustee moved in 1997 to have the bankruptcy court substantively consolidate all assets and liabilities of almost all Hoyt organization entities and the many Hoyt investor partnerships. This consolidation included all the investor partnerships. On November 13, 1998, the bankruptcy court entered its Judgment for Substantive Consolidation, consolidating all the above-mentioned entities for bankruptcy purposes. The trustee then sold off what livestock the Hoyt organization owned or managed on behalf of the investor partnerships.

Mr. Hoyt and others were indicted for certain Federal crimes, and a trial was conducted in the U.S. District Court for the District of Oregon. The District Court described Mr. Hoyt's actions as "the most egregious white collar crime committed in the history of the State of Oregon." Mr. Hoyt was found guilty on all counts, and as part of his sentence in the criminal case he was required to pay restitution in the amount of $102 million. This amount represented the total amount that the United States determined, using Hoyt organization records, was paid to the Hoyt

organization from 1982 through 1998 by investor-partners in various investor partnerships, including the partnership RCR #1.

RCR #1, which had been organized and promoted by Mr. Hoyt as a sheep breeding partnership, had begun operating in 1981. Mr. Hoyt was responsible for and directed the preparation of RCR #1's partnership income tax return for 1981, although he may not have prepared the return personally.

Barnes Ranches was a sheep breeding business owned and operated by David Barnes and April Barnes. David Barnes had experience in breeding several breeds of purebred sheep, including Hampshires, Rambouillets, and Suffolks. Randy Barnes, who had acquired a degree in agricultural business management in 1985, began working for Barnes Ranches in that year to handle the sheep breeding and feeding programs. By the late 1980's, David Barnes, along with Randy Barnes, had acquired very good reputations in purebred sheep breeding circles and were generally considered to be among the country's top breeders of Rambouillet and Suffolks. During the 1980s, Barnes Ranches typically would enter annually from 20 to 25 of their best yearling sheep in various national purebred sheep shows around the country, and their sheep often won awards at these shows.

Mr. Hoyt and David Barnes created documents that purported to represent transactions in which RCR #1 purchased sheep from Barnes Ranches. These documents included a "livestock bill of

sale", a "full recourse promissory note", a "certificate of assumption of primary liability", a "sharecrop operating agreement", and a "security agreement--registered sheep" (collectively the "sheep sale agreements").  The sheep sale agreements purported to document the purchase of registered purebred Rambouillet and Suffolk breeding ewes from Barnes Ranches.  While Mr. Hoyt and David Barnes were the principal individuals involved with the sheep sale agreements, Mr. Hoyt and the Barnes family were not independent parties acting at arm's length insofar as RCR #1's sheep breeding activities were concerned.  Mr. Hoyt signed "assumption agreements" on behalf of individual partners with respect to RCR #1's promissory notes. There are no bills of sale, certificates of assumption, partnership agreements, or promissory notes that were signed by partners other than Mr. Hoyt.

Under the sharecrop agreements, Barnes Ranches purportedly obligated itself to undertake all management with respect to the sheep partnerships' breeding of sheep, payment of expenses, and provision of stud ram services.  In exchange, Barnes Ranches was to receive all lambs produced and culls.  The terms of the sharecrop agreements required Barnes Ranches to maintain adequate records allowing it to identify at all times RCR #1's breeding sheep; to manage RCR #1's breeding sheep (which Barnes Ranches purportedly did in a commingled flock with the Barnes' own

sheep); to increase the number of RCR #1's breeding sheep by a net 5 percent each year; and to replace any ewe that could no longer serve as a breeding ewe with another ewe of a specified quality. RCR #1 received a livestock bill of sale from Barnes Ranches identifying the breeding sheep allegedly purchased by the partnership. According to the documents, RCR #1 agreed to pay $455,100 for a total of 401 sheep.

II.  Petitioner, Mr. Barnes, and Their Investment

Petitioner began taking college courses in 1963, after graduating from high school, and continued doing so until she received her undergraduate degree in psychology in 1984. Her education was primarily in the sciences and humanities, but it included accounting courses that she attended around 1964, as well as other business and legal courses. From approximately 1966 through 1970, petitioner worked as a secretary for the California Department of Rehabilitation. In 1970 and 1971, petitioner was employed in the Pentagon. After several years outside the workforce, petitioner worked as a secretary for the California State University, Sacramento, from approximately 1975 through 1986. In 1986, petitioner began working as a secretary for the California State Department of Corrections. In 1990, she was promoted to the position of budget analyst, where she remained until she retired from the State of California in 2000.

In 1966, petitioner married Mr. Barnes, who is the younger brother of David Barnes, when both petitioner and Mr. Barnes were approximately 21 years old. Mr. Barnes then received an undergraduate degree in personnel management from Sacramento State College in 1969. In 1981, Mr. Barnes was employed by the State of California as a personnel analyst. During the years of their marriage, petitioner and Mr. Barnes always discussed major decisions, such as purchasing a house, car, and other large expenditures. Prior to their separation in 1982, Mr. Barnes and petitioner maintained a joint checking account. They both deposited their paychecks into this account, and petitioner generally was responsible for paying the household bills from it. Petitioner and Mr. Barnes filed joint Federal income tax returns from 1966 through at least 1984. In the years 1978, 1979, 1980, and 1981, they reported total combined income of $30,610, $34,126, $42,032, and $45,078, respectively.[4] Petitioner's separate wage income during each of these years was $11,387, $12,713, $15,906, and $16,708, respectively. The 1978, 1979, and 1980 joint returns were prepared by independent accountants or tax return preparation services unaffiliated with Mr. Hoyt. Starting with the 1981 return and continuing through at least

---

[4]The total income of $45,078 for 1981 is the income reported by petitioner and Mr. Barnes prior to subtracting the partnership loss of $29,520.

1995, the joint returns and the separate returns filed by petitioner were prepared by Mr. Hoyt or one of his tax services.

In 1981, petitioner and Mr. Barnes met with Mr. Hoyt concerning a possible investment in a Hoyt investor partnership. Mr. Barnes had known Mr. Hoyt for many years prior to the time that petitioner and Mr. Barnes made their investment in 1981, and Mr. Barnes knew that Mr. Hoyt had been involved in cattle ranching. Prior to her meeting with Mr. Hoyt, petitioner believed that David Barnes was interested in raising sheep and that he was interested in expanding what essentially was his hobby into a commercial sheep ranching operation. Petitioner believed that David Barnes was working with Mr. Hoyt in developing a business related to sheep ranching, and petitioner knew that David Barnes wanted petitioner and Mr. Barnes to speak with Mr. Hoyt about this business. As a result of the 1981 meeting, petitioner and Mr. Barnes made the decision to invest in one of the sheep partnerships organized and promoted by Mr. Hoyt, namely RCR #1. Petitioner and Mr. Barnes did not invest any cash at the time they initially decided to make the investment. Instead, the invested funds were obtained using the tax refunds that Mr. Hoyt helped secure by preparing tax forms for petitioner and Mr. Barnes. Petitioner and Mr. Barnes agreed that Mr. Hoyt would retain 75 percent of the tax refunds that they were to receive, and that petitioner and Mr. Barnes would receive the

remaining 25 percent.  Prior to making her investment, petitioner did not independently investigate RCR #1--she did not review or physically visit its business operations, and she did not seek outside advice concerning it.  The only sheep connected with David Barnes that she saw prior to her investment were approximately 10 sheep that were located on David Barnes's property, sheep that petitioner believed were being raised by David Barnes and his daughter as a "4-H" or "Future Farmers" project.

For taxable year 1981, RCR #1 issued a Schedule K-1, Partner's Share of Income, Credits, Deductions, Etc., in connection with petitioner's and Mr. Barnes's investment in that partnership.  The schedule, which was addressed solely to Mr. Barnes, reflected capital contributions during the year of $30,020; partner's share of nonrecourse liabilities of $119,943; a flowthrough ordinary loss of $29,520; and basis of $151,600 in property eligible for the investment tax credit (ITC).

At the time of the meeting with Mr. Hoyt in 1981, petitioner and Mr. Barnes were having marital difficulties.  In 1982, petitioner and Mr. Barnes separated and began living apart, and in 1986 they were divorced.  At the time of the separation, Mr. Barnes remained in the marital home with the couple's daughter, and petitioner moved into an apartment.

Around the time of petitioner's divorce in 1986, she was informed that her partnership interest had been transferred from RCR #1 to a similar but separate partnership, River City Ranches #4 (RCR #4). Around this same time, petitioner personally began making substantial periodic cash payments to RCR #4; these payments were in addition to the indirect payments that petitioner was making to RCR #4 in the form of the tax refund checks that were being negotiated on her behalf. Petitioner continued investing in RCR #4 through at least 1995, and she continued claiming losses with respect to that investment on her income tax returns through that year.

By letter dated June 9, 1995, petitioner was notified by the Portland, Oregon, office of the Federal Bureau of Investigation (FBI) that the FBI and United States Postal Inspection Service were:

> conducting an investigation into allegations that W.J. Hoyt & Sons and its affiliated entities, and certain associated individuals, engaged in conduct and/or practices that may be violations of federal criminal fraud statutes.

Attached to this letter was a questionnaire pertaining to petitioner's involvement in "one or more of the W.J. Hoyt & Sons investment programs." Petitioner completed portions of this questionnaire. In answer to the question "How did you first hear of Hoyt & Sons or any of its related entities", petitioner responded "Relatives were involved in livestock business and were

personal friends of Hoyt family." Petitioner stated that her first contact with Hoyt & Sons was through a sales presentation that was attended by herself, Mr. Barnes, and Mr. Hoyt. Petitioner stated that she and Mr. Barnes were told at this meeting that "We would be investing in sheep/livestock; buying, raising, selling; and investing in ranch properties and equipment, feed and grain." Petitioner stated that she and Mr. Barnes invested $20,000 in the partnership RCR #4 in 1980, and that the money was provided in the form of a cashier's check from personal savings and/or from "income tax recapture".[5] Petitioner further stated that she made the investment because:

> It sounded like a reasonable investment opportunity; one that we could follow and participate in locally. Initially as limited partners, it was considered a passive partnership.

Petitioner stated that she "started out as a limited partner and remained so for 7 or 8 years", and as of 1995 she was "still an active partner". Finally, petitioner stated in the questionnaire:

> It really disgusts me that a number of "partnership dropouts" are engaging in such subversive activities to destroy the Hoyt partnerships. These people apparently did not understand the partnerships or perhaps had expectations that exceeded what is real. The tax matters have been a horror, mostly because [the] IRS keeps changing the tax laws and thus attempts to

---

[5]The record establishes that the meeting was in 1981 rather than 1980; that petitioner and Mr. Barnes initially invested in RCR #1; and that they did not invest any cash in the partnership at the time of the initial investment.

undermine people simply trying to conduct a legitimate and productive business.

In July 2001, petitioner testified in a proceeding in this Court concerning her involvement in the Hoyt partnerships.[6] In this prior testimony, petitioner stated that when she and Mr. Barnes made the investment, she was "drawn into" it because of the involvement of the Barnes family, but that she felt that she would be supporting the family operation and that it was her "understanding that it was an investment in ranching * * * for the long term", one that would involve "some tax advantages". Petitioner further stated that she and Mr. Barnes "signed the papers to enter the investment". Finally, petitioner testified that she believed at the time of the initial investment with Mr. Barnes that she was investing in "an overall ranching business".

Petitioner is employed by a winery named Madrona Vineyards, where she is receiving monthly wages of $757. In addition, petitioner is receiving pension income of approximately $2,186 per month. Petitioner lives with Lawrence Edwards (Mr. Edwards), whom she married in 1997, in a residence that they purchased in 1991 for $225,000. Petitioner's only long-term debt obligations are the monthly mortgage payment on the residence, her portion of which is $360, and a monthly payment on a 2001 Jeep Cherokee of

---

[6]The opinion of the Court in that proceeding, which involved numerous consolidated cases, is River City Ranches #1 Ltd. v. Commissioner, T.C. Memo. 2003-150.

$295.  Petitioner and Mr. Edwards do not financially support any dependents.  The combined wage and salary income of petitioner and Mr. Edwards, who is employed as an environmental consultant and community college teacher, was approximately $70,000 in both 2001 and 2002.  Petitioner has individual retirement accounts with balances of $3,895, $15,745, and $1,595; a savings account with a balance of $3,335; and a checking account with a balance of $1,635.  Finally, petitioner owes approximately $8,900 on credit card accounts, and she estimates her total monthly living expenses to be $2,748.

III. Petitioner's 1981 Tax Return and the ITC Carrybacks

Petitioner filed a joint Federal income tax return with Mr. Barnes for the taxable year 1981.  On the return, petitioner claimed a deduction for an ordinary loss from RCR #1 of $29,520.  This deduction offset the combined wage income of $45,078, resulting in an adjusted gross income of $15,558.  In addition to the deduction, petitioner reported a qualified investment of $151,600 on a Form 3468, Computation of Investment Credit, resulting in a tentative ITC of $15,160.  Petitioner applied $287 of this credit against the 1981 tax liability, reducing the tax liability to zero.  The 1981 return reflected an overpayment resulting in a refund of $8,257.

In addition to the 1981 return, petitioner filed a Form 1045, Application for Tentative Refund, on which she requested

refunds for 1978, 1979, and 1980 based upon a carryback of the unused 1981 ITC. In each respective year, a credit in the amount of $4,053, $4,610, and $6,209 was applied, resulting in a tax liability of zero, $223, and $949, and refunds of $3,834, $4,420, and $6,025.

The combined wage income reported on the joint returns filed by petitioner for taxable years 1978, 1979, 1980, and 1981 totaled $151,564. After filing the 1981 return and the Form 1045, petitioner's claimed total tax liability for these four years was $1,172. The refunds reflected on the return and the Form 1045 totaled $22,536.

Petitioner signed both the 1981 joint return and the Form 1045. Petitioner reviewed the 1981 return before signing it. Petitioner, however, did not ask Mr. Barnes or Mr. Hoyt, or any independent tax adviser, how the $29,520 loss was calculated. Nor did petitioner make any inquiries concerning how such a loss could be generated when she and Mr. Barnes had not invested any cash in the partnership as of that date.

After auditing RCR #1, respondent disallowed the partnership loss claimed by RCR #1 in 1981. In the notice of deficiency underlying this case, respondent determined the deficiencies and additions to tax listed in detail above, based upon the disallowance of RCR #1's 1981 partnership loss and the related ITC carryback from 1981 to 1978, 1979, and 1980.

OPINION

I.  Evidentiary Issues

As a preliminary matter, we address evidentiary issues raised by the parties in the stipulations of facts.  First, both parties reserved objections in the stipulations on the grounds of relevancy:  Petitioner reserved an objection to Exhibit 17-R, and respondent reserved objections to Exhibits 400-P through 476-P, Exhibits 478-P through 490-P, and paragraphs 10, 11, and 12 of the Fourth Stipulation of Facts.  Federal Rule of Evidence 402[7] provides the general rule that all relevant evidence is admissible, while evidence which is not relevant is not admissible.  Federal Rule of Evidence 401 provides that "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  While certain of the exhibits and stipulated facts are given little to no weight in our finding of ultimate facts in this case, we hold that the exhibits and stipulated facts meet the threshold definition of "relevant evidence" under Federal Rule of Evidence 401, and that the exhibits and stipulated facts therefore are admissible under Federal Rule of Evidence 402.

---

[7]The Federal Rules of Evidence are applicable in this Court pursuant to section 7453 and Rule 143(a).

Next, respondent reserved hearsay objections to Exhibits 400-P, 401-P, 405-P, and 478-P. We need not address these objections, however, because they were withdrawn by respondent in his opening brief.

Finally, respondent reserved an objection to Exhibit 402-P on the grounds that the exhibit is incomplete. Again, while the incomplete nature of the document affects the weight that it is accorded in our findings, we overrule respondent's objection and hold that the exhibit is admissible. See, e.g., Goichman v. Commissioner, T.C. Memo. 1987-489 n.12.

## II. Negligence

With respect to each of the years in issue, section 6653 imposes one or more additions to tax on certain underpayments attributable to negligence or intentional disregard of rules and regulations. With respect to petitioner's taxable years 1978, 1979, and 1980, the addition to tax under section 6653(a) is equal to 5 percent of the entire amount of an underpayment if any part of the underpayment is due to negligence or intentional disregard of rules or regulations. With respect to petitioner's taxable year 1981, the addition to tax under section 6653(a)(1) is the same as that imposed under the former section 6653(a). However, with respect to that year, section 6653(a)(2) provides for a further addition to tax equal to 50 percent of the interest due on only that portion of the underpayment that is attributable

to negligence or intentional disregard of rules or regulations. With respect to each of the years in issue, an "underpayment" is defined, as applicable in this case, to be equal to the amount of any deficiency. Sec. 6653(c)(1).

Negligence is defined as the "lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances." Neely v. Commissioner, 85 T.C. 934, 947 (1985) (quoting Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), affg. in part and remanding in part on another ground 43 T.C. 168 (1964)); see Allen v. Commissioner, 925 F.2d 348, 353 (9th Cir. 1991), affg. 92 T.C. 1 (1989). Negligence is determined by testing a taxpayer's conduct against that of a reasonable, prudent person. Zmuda v. Commissioner, 731 F.2d 1417, 1422 (9th Cir. 1984), affg. 79 T.C. 714 (1982). Courts generally look both to the underlying investment and to the taxpayer's position taken on the return in evaluating whether a taxpayer was negligent. Sacks v. Commissioner, 82 F.3d 918, 920 (9th Cir. 1996), affg. T.C. Memo. 1994-217.

The Commissioner's decision to impose the negligence addition to tax is presumptively correct. Collins v. Commissioner, 857 F.2d 1383, 1386 (9th Cir. 1988), affg. Dister v. Commissioner, T.C. Memo. 1987-217; Hansen v. Commissioner, 820 F.2d 1464, 1469 (9th Cir. 1987). A taxpayer has the burden of proving that respondent's determination is erroneous and that she

did what a reasonably prudent person would have done under the circumstances. See Rule 142(a); Hansen v. Commissioner, supra; Hall v. Commissioner, 729 F.2d 632, 635 (9th Cir. 1984), affg. T.C. Memo. 1982-337; Bixby v. Commissioner, 58 T.C. 757, 791 (1972).[8]

A central theme in petitioner's arguments concerning several issues in this case, including whether she was negligent, is her assertion that she was not an investor in RCR #1. We therefore address this factual issue before addressing petitioner's liability for the additions to tax for negligence.

There is little documentary evidence in the record concerning the initial investment in RCR #1 by Mr. Barnes and petitioner. Most notably, none of the original partnership agreements were received into evidence. Thus, there is no documentary evidence corroborating petitioner's assertion that she did not sign the original documents. The record does include a Schedule K-1 that was issued by RCR #1 to Mr. Barnes in 1981. Petitioner argues that this document shows that she was not an investor in the partnership. Based on the record as a whole, however, we decline to give the Schedule K-1 such significant

---

[8]Sec. 7491, as currently in effect, shifts the burden of production and/or proof to the Commissioner in certain situations. However, this section is not applicable in this case because the underlying examination did not commence after July 22, 1998. Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, sec. 3001(c), 112 Stat. 727.

weight:  The omission of petitioner's name could have been due to any of a number of reasons, such as an oversight by the person who prepared the Schedule K-1.  In short, this document standing alone does not corroborate petitioner's assertion that she was not an investor in RCR #1.

Aside from the Schedule K-1, the primary evidence in the record that petitioner was not an investor in RCR #1 is petitioner's own testimony.  In her testimony, petitioner admitted that she was at the investment sales meeting with Mr. Barnes and Mr. Hoyt.  Petitioner, however, stated that she was "sort of there in body but not really in spirit or mind", because she was preoccupied with the state of her marriage and because she was worried about her daughter.  Petitioner nevertheless testified in great detail concerning certain aspects of this meeting.  For example, petitioner testified that she recalled the posture of herself and Mr. Barnes in their chairs, and she stated that Mr. Hoyt "wasn't even making eye contact with me that much".  She also stated that she recalled Mr. Hoyt's mentioning that he was an enrolled agent, at which point petitioner, according to her testimony, asked him what an enrolled agent was.  Petitioner further stated that she did not realize, at the time the meeting took place, that Mr. Hoyt was attempting to convince petitioner and Mr. Barnes to make an investment in the partnership.  On the other hand, petitioner testified that she does recall Mr. Hoyt's

mentioning that there were tax benefits of making such an investment.  Petitioner testified that she inquired into the legality of these tax benefits.

We do not accept petitioner's testimony as reliable evidence concerning the meeting with Mr. Hoyt, a meeting that occurred approximately 22 years prior to trial.  The testimony is self-serving and uncorroborated, and we therefore are not required to accept it as credible evidence.  See Niedringhaus v. Commissioner, 99 T.C. 202, 212, 219-220 (1992); Tokarski v. Commissioner, 87 T.C. 74, 77 (1986).  Furthermore, we find certain details provided by petitioner to be contradictory.  For example, while petitioner testified that she did not want to be at the meeting and that she was completely uninterested in the subject matter being discussed, she testified that she recalls that she asked specific questions concerning Mr. Hoyt's credentials and the legality of the investment.  We also do not accept that petitioner, with her level of education and background, would have been present at the sales meeting without realizing it was in fact an attempt to sell petitioner and Mr. Barnes an investment.

Petitioner further testified that she was unaware that Mr. Barnes signed any investment papers prior to the time they filed their 1981 joint return:  It was only when she signed the return that she learned Mr. Barnes had decided to invest in the

partnership.  Petitioner stated that she did not consider herself an investor in the partnership until the time of her divorce. Around that time, petitioner had approached April Barnes to inquire into the status of the investment.  Petitioner asserts that April Barnes informed her that she "could not" leave the partnership, and that petitioner was subsequently forced into accepting her status as an investor because of certain documents which she was told she had signed, but with respect to which she had no memory.  Petitioner testified that she "had to" continue claiming Hoyt-related losses from 1981 through 1995.

We do not accept these assertions by petitioner.  Firstly, petitioner's version of events presented in her testimony and on brief are belied by the version of events that she provided to the FBI in 1995.  In responding to the FBI questionnaire, petitioner very clearly held herself out to be a willing partner in the Hoyt partnership.  She stated that she had been a partner since 1980, and she defended the validity of her investment and the Hoyt organization.  Petitioner never stated that her status as a partner started only after her divorce.  Petitioner also derided certain investors who had previously decided to abandon their interests in the partnerships as engaging in "subversive activities".

Secondly, the version of events presented by petitioner in her prior testimony, discussed in detail above,[9] also clearly indicates that petitioner considered herself an investor in 1981. While she stated that her decision to invest was influenced by family ties, she also stated that she understood that she was making a long-term investment and that she signed documents relating to that investment.

Finally, certain of petitioner's assertions at trial and on brief are also contradicted by the facts alleged in the first Amendment to Petition in which petitioner set forth her claim for section 6015 relief. In this pleading, while petitioner did allege that she "did not have any real choice in the investment, but was drawn into the investment by Don Barnes to support the family business", she also alleged that "At the time of the investment, [she] understood that the investment was a long term retirement investment in the family ranching enterprise, as well as some tax advantages associated with the investment". This latter allegation contradicts petitioner's assertion at trial and on brief that she did not realize that an investment had been made until the tax return was filed. Even more contradictory is petitioner's allegation in the pleading that, when she and Mr. Barnes "originally signed the partnership documents, they were advised by Jay Hoyt that they were signing on as 'Limited

[9]See discussion infra note 10.

Partners'". Petitioner now denies signing any partnership documents.[10]

Based on the record as a whole, we conclude that petitioner was an investor in the partnership RCR #1, and that she invested in the partnership in 1981.

Petitioner argues that she is not liable for the negligence additions to tax because she had "reasonable cause for tax claims on the subject returns" and that she made "reasonable inquiries into ascertaining the nature of the claim and received assurances of its accuracy." In support of this argument, petitioner asserts that she reasonably relied on Mr. Hoyt to accurately prepare her returns.

Good faith reliance on professional advice concerning tax laws may be a defense to the negligence penalties. United States v. Boyle, 469 U.S. 241, 250-251 (1985). However, "Reliance on professional advice, standing alone, is not an absolute defense to negligence, but rather a factor to be considered". Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991). In order to be considered as such, the reliance must be reasonable. Id. To be objectively

---

[10]Similar contradictory statements were made in the initial petition signed by both petitioner and Mr. Barnes. In the petition, petitioner alleges that she was a general partner in RCR #1 (as well as another partnership, River City Ranches #2) during 1981, and that she was personally liable on a note in the amount of $116,780 related to her partnership investment.

reasonable, the advice generally must be from competent and independent parties unburdened with an inherent conflict of interest, not from the promoters of the investment. Goldman v. Commissioner, 39 F.3d 402, 408 (2d Cir. 1994), affg. T.C. Memo. 1993-480; LaVerne v. Commissioner, 94 T.C. 637, 652 (1990), affd. without published opinion sub nom. Cowles v. Commissioner, 949 F.2d 401 (10th Cir. 1991), affd. without published opinion 956 F.2d 274 (9th Cir. 1992); Rybak v. Commissioner, 91 T.C. 524, 565 (1988); Edwards v. Commissioner, T.C. Memo. 2002-169.

It is clear in this case that the advice petitioner received, if any, concerning the items resulting in the deficiencies was not objectively reasonable. First, we note that petitioner has not established that she received any advice at all concerning the deduction and credits. Although petitioner relied on Mr. Hoyt to prepare the return and the tentative refund form, petitioner's testimony and the other evidence in the record does not suggest that she directly questioned Mr. Hoyt about the nature of the tax claims. Petitioner testified only that she asked Mr. Hoyt about the general legality of the investment and tax benefits at the time of the sales meeting. When petitioner signed the return and form, she did not question or seek advice concerning the large deduction and credits appearing on them. Nevertheless, assuming arguendo that petitioner did receive advice from Mr. Hoyt, any such advice that she received is in no

manner objectively reasonable.  Mr. Hoyt was the primary creator and promoter of the RCR #1 partnership, and Mr. Hoyt was receiving petitioner's tax refund checks from the Government, cashing them, and retaining the bulk of the proceeds.  For petitioner to trust Mr. Hoyt for tax advice and/or to prepare her returns under these circumstances was inherently unreasonable.

Finally, petitioner argues that she was defrauded by Mr. Hoyt, and that any amount of investigation on her part would have failed to undercover his criminal activities with respect to the investor partnerships.  This argument is mere speculation by petitioner, however, because petitioner never investigated the partnerships.  While Mr. Hoyt may have misled petitioner concerning the investment, petitioner nevertheless was negligent in not investigating the promoter's claims or otherwise inquiring into the nature of the tax benefits that she claimed on her return, benefits which on their face reduced petitioner's tax liability to nearly zero over a span of four years--all without any prior cash investment by petitioner or Mr. Barnes.

Petitioner asserts that a prior case decided by this Court, Bales v. Commissioner, T.C. Memo. 1989-568, is relevant in the inquiry into whether petitioner was negligent.  Bales involved deficiencies asserted against various investors in several different cattle partnerships marketed by Mr. Hoyt.  This Court found in favor of the investors on several issues, stating that

"the transaction in issue should be respected for Federal income tax purposes." Petitioner's reliance on Bales is misplaced. The case was decided in 1989, years after petitioner invested in RCR #1. Thus, petitioner cannot claim that she relied on the case in evaluating the propriety of the deduction and credits that she claimed on her return. Petitioner, however, also argues that, because the Court was unable to uncover fraud or deception by Mr. Hoyt in Bales, petitioner as an individual taxpayer was in no position to evaluate the legitimacy of RCR #1 or the tax benefits claimed with respect thereto. This argument employs the Bales case as a red herring: The Bales case involved different investors, different partnerships, different taxable years, and different issues. Furthermore, adopting petitioner's position would imply that taxpayers should have been given carte blanche to invest in partnerships promoted by Mr. Hoyt, merely because Mr. Hoyt had previously engaged in activities which withstood one type of challenge by the Commissioner, no matter how illegitimate the partnerships had become or how unreasonable the taxpayers were in making investments therein and claiming the tax benefits that Mr. Hoyt promised would ensue.

In summary, petitioner invested in RCR #1, and petitioner subsequently signed the tax return and tentative refund request form that, in combination, claimed to reduce petitioner's tax liability over a 4-year period to $1,172, resulting in a combined

refund of $22,536.  Petitioner was not an uneducated person, yet she took these actions without consulting an independent adviser concerning the viability of the partnership as an investment vehicle, or concerning the validity of the tax claims being made with respect thereto.  Instead, on both fronts petitioner relied completely on Mr. Hoyt--the promoter of the partnership and the same person who was retaining the bulk of petitioner's tax refunds, refunds obtained by Mr. Hoyt through the preparation of petitioner's tax returns.  Petitioner never inquired into how the large deduction and credits were calculated, and she never questioned their legitimacy.  We find that petitioner's actions-- with respect to the investment and with respect to the items on her tax return and tentative refund claim--reflect a lack of due care and a failure to do what a reasonable or ordinarily prudent person would do under the circumstances.  We therefore hold that petitioner was negligent within the meaning of section 6653 with respect to the entire amount of the deficiency in each year in issue.

III. Valuation Overstatements

In general, section 6659(a)[11] imposes an addition to tax on any portion of an underpayment of income tax by an individual which is "attributable to a valuation overstatement". A "valuation overstatement" exists "if the value of any property, or the adjusted basis of any property, claimed on any return is 150 percent or more of the amount determined to be the correct amount". Sec. 6659(c)(1). The amount of the addition to tax varies depending upon the size of the discrepancy in the valuation. Sec. 6659(b). Respondent determined that the entire amount of the deficiency in each year in issue is attributable to a valuation that was more than 250 percent of the correct valuation, resulting in an addition to tax of 30 percent in each year. See id.

Petitioner's only arguments concerning this issue were made in the context of her objections to the application of the section 6621 tax motivated interest, an issue that is discussed below. First, petitioner argues that "Respondent concluded in

_____

[11]References to sec. 6659 are to sec. 6659 as in effect with respect to returns that were filed after Dec. 31, 1981, and that were due before Jan. 1, 1990. See Economic Recovery Tax Act of 1981, Pub. L. 97-34, sec. 722(a), 95 Stat. 341; OBRA 1989 sec. 7721, 103 Stat. 2395. We note that, where a valuation overstatement on a return filed after Dec. 31, 1981, gives rise to an underpayment for a year prior to 1981 by operation of a carryback, then that underpayment is attributable to the overstatement on the return filed in the later year, and sec. 6659 is applicable with respect to the resulting underpayment in the earlier year. Nielsen v. Commissioner, 87 T.C. 779 (1986).

the audit of RCR #1 for the tax years at issue that there was no basis for asserting an overvaluation penalty." As support for this argument, petitioner cites a document taken from respondent's administrative file relating to petitioner's request for section 6015 relief. This document states that "Per information from Joe Pierce, TEFRA Review Coordinator for the Hoyt Project, the overvaluation penalty should not be proposed." The role of this document in the context of the ultimate issuance of the notice of deficiency is unclear. However, petitioner's contention in her brief that this document shows that respondent's assertion of the addition to tax is "disingenuous" is not persuasive. There is nothing in the record showing that respondent's assertion of the addition to tax in the notice of deficiency was arbitrary or that it involved unconstitutional conduct, and in the absence of such a showing this Court does not go behind a notice of deficiency to ascertain respondent's motives in asserting a deficiency or addition to tax. Rountree Cotton Co. v. Commissioner, 113 T.C. 422, 426 (1999), affd. 12 Fed. Appx. 641 (10th Cir. 2001); Greenberg's Express, Inc. v. Commissioner, 62 T.C. 324, 327-328 (1974).

Petitioner further argues that a tax underpayment is not "attributable to" a taxpayer's overvaluation of property where "an alternative ground for the deficiency is sustained", such as where the relevant property was never placed in service. See,

e.g., <u>Gainer v. Commissioner</u>, 893 F.2d 225 (9th Cir. 1990), affg. T.C. Memo. 1988-416.  Petitioner, however, has provided no evidence that this is the situation here.  With respect to petitioner's implication that the relevant property in this case was never placed in service, we note that there is evidence in the record indicating that Mr. Hoyt and others involved in the partnerships in fact did sell "phantom" livestock to investors in certain instances.  However, there is also evidence in the record--including evidence stipulated by the parties--that the livestock purchased by some investors actually did exist, but that it was greatly overvalued.  Petitioner has presented no evidence regarding any specific property at issue in this case, let alone tending to show that such property was never placed in service.  Nor has petitioner shown that any portion of any of the deficiencies in this case was otherwise not attributable to a valuation overstatement.  Because petitioner bears the burden of proof in showing respondent's determinations in the notice of deficiency to be in error, see Rule 142(a),[12] we sustain respondent's determination that the deficiencies were attributable to valuation overstatements.

---

[12]See <u>supra</u> note 8.

IV.  Tax Motivated Interest

Section 6621(c) provides an increased rate of interest for "any substantial underpayment attributable to tax motivated transactions".  A "substantial underpayment attributable to tax motivated transactions" is defined under section 6621(c)(2) as "any underpayment of taxes imposed by subtitle A for any taxable year which is attributable to 1 or more tax motivated transactions if the amount of the underpayment for such year so attributable exceeds $1,000."  A "tax motivated transaction" is defined under section 6621(c)(3)(A) to include "any valuation overstatement (within the meaning of section 6659(c))" and "any credit disallowed under section 46(c)(8)".  Sec. 6621(c)(3)(A)(i) and (ii).  In general, section 46(c)(8) limits a taxpayer's basis in certain depreciable property to the amount the taxpayer is "at risk" with respect to such property, thereby limiting the amount of investment tax credit available to the taxpayer.  Sec. 46(a), (c)(1), (c)(8)(A).

While respondent's arguments concerning the applicability of section 6621(c) center on whether respondent disallowed the credits under section 46(c)(8), we need not reach those arguments.  Section 6621(c) also applies the increased rate of interest to underpayments of tax that are attributable to valuation overstatements, as that term is defined under section 6659(c).  Sec. 6621(c)(3)(A)(i).  Because we have sustained

respondent's determination that the entire amount of the deficiency in each year is attributable to a valuation overstatement under section 6659, we likewise sustain respondent's determination that the section 6621(c) increased rate of interest is applicable with respect thereto.

V.   Relief Under Section 6015

In general, spouses filing joint Federal income tax returns are jointly and severally liable for all taxes due with respect to such returns.  Sec. 6013(d)(3).  Under certain circumstances, however, section 6015 provides relief from joint and several liability.  There are three separate avenues of relief under section 6015--section 6015(b), section 6015(c), and section 6015(f).  Petitioner alternatively argues that she is entitled to relief under each of these provisions.

A.   Section 6015(b)

Section 6015(b) provides relief from liability for taxes, including interest, penalties, and other amounts, that is attributable to certain understatements appearing on joint returns.  To qualify for relief under section 6015(b)(1), a taxpayer must establish:

> (A) a joint return has been made for a taxable year;
>
> (B) on such return there is an understatement of tax attributable to erroneous items of 1 individual filing the joint return;
>
> (C) the other individual filing the joint return establishes that in signing the return he or she did not

know, and had no reason to know, that there was such understatement;

> (D) taking into account all the facts and circumstances, it is inequitable to hold the other individual liable for the deficiency in tax for such taxable year attributable to such understatement; and
>
> (E) the other individual elects (in such form as the Secretary may prescribe) the benefits of this subsection not later than the date which is 2 years after the date the Secretary has begun collection activities with respect to the individual making the election * * * .

These requirements are stated in the conjunctive:  A taxpayer is not entitled to relief if any one of the requirements is not satisfied.

We first address the requirement found in section 6015(b)(1)(B); namely, the requirement that the understatement with respect to which a taxpayer seeks relief must be attributable to an erroneous item of the other individual filing the joint return.  If the understatement is attributable to an erroneous item of both the taxpayer and the other individual filing the return, the taxpayer is not entitled to relief under section 6015(b).  See, e.g., Bartak v. Commissioner, T.C. Memo. 2004-83; Ellison v. Commissioner, T.C. Memo. 2004-57; Doyel v. Commissioner, T.C. Memo. 2004-35.  For the reasons discussed above in connection with the additions to tax for negligence, we have concluded that both petitioner and Mr. Barnes were investors in RCR #1.  Consequently, the understatement in each year in issue is attributable to erroneous items of both petitioner and

Mr. Barnes, and petitioner therefore is not entitled to relief under section 6015(b).  Sec. 6015(b)(1)(B).  Nevertheless, we briefly consider whether petitioner meets the requirements of section 6015(b)(1)(C) and (D).

For purposes of section 6015(b)(1)(C), the relief-seeking spouse knows of an understatement of tax if he or she knows of the transaction that gave rise to the understatement.  Jonson v. Commissioner, 118 T.C. 106, 115 (2002), affd. 353 F.3d 1181 (10th Cir. 2003).  In general, the relief-seeking spouse has reason to know of an understatement if he or she has reason to know of the transaction that gave rise to the understatement.  Id.  While courts consistently apply this "reason to know" standard to omission of income cases, certain Courts of Appeals, including the Court of Appeals for the Ninth Circuit, to which appeal lies in this case, have adopted what has been labeled a more lenient approach to deduction cases.  Price v. Commissioner, 887 F.2d 959, 963 (9th Cir. 1989), revg. an Oral Opinion of this Court; Jonson v. Commissioner, supra at 115.

In Price v. Commissioner, supra at 965, the Court of Appeals for the Ninth Circuit stated:

> A spouse has "reason to know" of the substantial understatement if a reasonably prudent taxpayer in her position at the time she signed the return could be expected to know that the return contained the substantial understatement.  Factors to consider in analyzing whether the alleged innocent spouse had "reason to know" of the substantial understatement include:  (1) the spouse's level of education; (2) the

spouse's involvement in the family's business and
financial affairs; (3) the presence of expenditures
that appear lavish or unusual when compared to the
family's past levels of income, standard of living, and
spending patters; and (4) the culpable spouse's
evasiveness and deceit concerning the couple's
finances.  [Citations omitted.]

Under the Price approach, a spouse's knowledge of the transaction
underlying the deduction is not irrelevant; the more a spouse
knows about a transaction, "the more likely it is that she will
know or have reason to know that the deduction arising from that
transaction may not be valid."  Price v. Commissioner, supra at
963 n.9.

In the present case, petitioner was acquiring a college
education during the years in issue.  She was involved in her
family's financial affairs, and she participated in the decision-
making process with respect to large expenditures.  There is no
evidence of evasiveness or deceit by Mr. Barnes.  In fact, in
this case petitioner was involved in the Hoyt investment, she
knew the investment was designed to generate substantial tax
savings, she knew that those savings were derived from positions
taken on the joint returns for the years in issue, and the
investment materials clearly and repeatedly indicated that the
tax benefits would almost assuredly be disputed by the IRS.

"Tax returns setting forth large deductions, such as tax
shelter losses offsetting income from other sources and
substantially reducing or eliminating the couple's tax liability,

generally put a taxpayer on notice that there may be an understatement of tax liability." Hayman v. Commissioner, 992 F.2d 1256, 1262 (2d Cir. 1993), affg. T.C. Memo. 1992-228. The court in Price v. Commissioner, supra at 966, likewise noted that "the size of the deduction * * * viz-a-viz the total income reported on the return * * *, when considered in light of the fact that" the taxpayer knew of the investment and its nature, is enough to put the taxpayer on notice that an understatement exists and to result in a duty of inquiry. If the duty of inquiry arises but is not satisfied by the taxpayer, constructive knowledge of the understatement may be imputed to the taxpayer. Id. at 965. Because petitioner did not ask any questions about the Hoyt investment deduction and credits, which were large in relation to the income reported by petitioner and Mr. Barnes and nearly eliminated their Federal tax liability, petitioner did not satisfy her duty to inquire. Accordingly, we conclude that a reasonable person, faced with petitioner's circumstances and in petitioner's position, would have had reason to know of the understatements.

Finally, we note that, for the same reasons discussed below in connection with respondent's denial of section 6015(f) relief, we conclude that the requirement of section 6015(b)(1)(D) has not been met because it would not be inequitable, taking into account

all the facts and circumstances, to hold petitioner liable for the deficiencies and additions to tax in this case.

B.  Section 6015(c)

Section 6015(c) allows a taxpayer to elect that her liability for any deficiency with respect to the joint return be limited to the portion of such deficiency which is "properly allocable" to her under section 6015(d).  A taxpayer is not entitled to relief under section 6015(c) with respect to any portion of any deficiency if the Commissioner shows that the taxpayer "had actual knowledge, at the time such individual signed the return, of any item giving rise" to that portion of the deficiency.  Sec. 6015(c)(3)(C).  In the context of a disallowed deduction, actual knowledge is present if the taxpayer had actual knowledge of the factual circumstances which made the item unallowable as a deduction; knowledge of the tax consequences resulting from the factual circumstances is not required.  King v. Commissioner, 116 T.C. 198, 204 (2001).  Respondent bears the burden of proving that the taxpayer requesting section 6015(c) relief had the relevant actual knowledge.  Sec. 6015(c)(3)(C); King v. Commissioner, supra.  In this case, respondent denied petitioner relief pursuant to section 6015(c) solely on the grounds that petitioner had actual knowledge within the meaning of section 6015(c)(3)(C).  Respondent, however, conceded on brief that he has not shown

petitioner had actual knowledge of the items giving rise to the deficiencies in this case. Consequently, respondent concedes that petitioner is entitled to section 6015(c) relief.

Section 6015(d) allocates a deficiency between a taxpayer entitled to section 6015(c) relief and the other individual filing the joint return. The general rule for the allocation of the deficiency provides that:

> The portion of any deficiency on a joint return allocated to an individual shall be the amount which bears the same ratio to such deficiency as the net amount of items taken into account in computing the deficiency and allocable to the individual under paragraph (3) bears to the net amount of all items taken into account in computing the deficiency.

Sec. 6015(d)(1). An item giving rise to a deficiency generally is "allocated to individuals filing the return in the same manner as it would have been allocated if the individuals had filed separate returns for the taxable year." Sec. 6015(d)(3)(A). However, items giving rise to a deficiency that are otherwise allocable to one individual must be allocated to the other individual if she received a "tax benefit" from the items on the joint return. Sec. 6015(d)(3)(B).

Respondent argues that the items giving rise to the deficiencies in this case are allocable equally to petitioner and Mr. Barnes. Petitioner argues that the items are allocable solely to Mr. Barnes. Because we have found that petitioner and Mr. Barnes were both investors in the partnership, as discussed

above in connection with the negligence additions to tax, we agree with respondent that the items are allocable equally to petitioner and Mr. Barnes. The amounts of the deficiencies allocable to petitioner and Mr. Barnes under section 6015(d) shall be determined in the Rule 155 computations by the parties, taking into account our findings and the "tax benefit" rule of section 6015(c)(3)(B).

C. Section 6015(f)

Section 6015(f) allows the Secretary to relieve a taxpayer from liability where, taking into account all the facts and circumstances, it is inequitable to hold the taxpayer liable for any unpaid tax or deficiency (or portion thereof). Relief is available to a taxpayer under section 6015(f) only to the extent that it is not available under either section 6015(b) or (c). Sec. 6015(f)(2). Because petitioner qualifies for relief under section 6015(c) with respect to the portions of the deficiencies allocable to Mr. Barnes under section 6015(d), we address petitioner's eligibility for section 6015(f) relief only with respect to the portions of the deficiencies allocable to her.

We review the Commissioner's denial of relief under section 6015(f) for an abuse of discretion. Butler v. Commissioner, 114 T.C. 276, 291-292 (2000). An abuse of discretion occurs where the Commissioner acts arbitrarily, capriciously, or without sound basis in fact. Jonson v. Commissioner, 118 T.C. 106, 125 (2002),

affd. 353 F.3d 1181 (10th Cir. 2003). A taxpayer bears the burden of proving that the Commissioner abused his discretion. Washington v. Commissioner, 120 T.C. 137, 146 (2003).

Pursuant to section 6015(f), the Commissioner has prescribed procedures to determine whether a taxpayer qualifies for relief under that section. Those procedures are set forth in Rev. Proc. 2000-15, 2000-1 C.B. 447. This Court has upheld the use of those procedures in reviewing a negative determination for relief from joint and several liability. Jonson v. Commissioner, supra.

Section 4.01 of Rev. Proc. 2000-15, 2000-1 C.B. at 448, lists seven threshold conditions that must be satisfied before the Commissioner will consider a request for relief under section 6015(f). If the threshold conditions are satisfied, relief may be granted under section 4.02 of Rev. Proc. 2000-15, which applies to relief from liability that is reported on a joint return but that remains unpaid. If that section does not apply, the Commissioner looks to section 4.03 of Rev. Proc. 2000-15 to determine whether the taxpayer should be granted relief. In this case, respondent does not assert that petitioner has failed to meet any of the threshold requirements of section 4.01 of Rev. Proc. 2000-15. Because the liability in question was not reported on the joint return, section 4.02 of Rev. Proc. 2000-15 is not applicable in this case. We therefore turn to section

4.03 of Rev. Proc. 2000-15 to review respondent's denial of relief for an abuse of discretion.

Section 4.03 of Rev. Proc. 2000-15 provides a nonexhaustive list of factors that the Commissioner is to take into account in determining whether to grant full or partial relief under section 6015(f). The revenue procedure provides that no single factor is to be determinative; rather, all factors are to be considered and weighted appropriately. Section 4.03(1) of Rev. Proc. 2000-15 lists six factors that, if present, the Commissioner will consider as weighing in favor of granting relief for an unpaid liability (positive factors), and section 4.03(2), 2000-1 C.B. at 449, lists six factors that, if present, the Commissioner will consider as weighing against granting relief for an unpaid liability (negative factors). The following are the positive factors set forth in the revenue procedure, as they apply to this case:

> (a) <u>Marital status</u>. The requesting spouse is * * * divorced from the nonrequesting spouse.
>
> (b) <u>Economic hardship</u>. The requesting spouse would suffer economic hardship (within the meaning of section 4.02(1)(c) of this revenue procedure) if relief from the liability is not granted.
>
> (c) <u>Abuse</u>. The requesting spouse was abused by the nonrequesting spouse, but such abuse did not amount to duress.
>
> (d) <u>No knowledge or reason to know</u>. * * * In the case of a liability that arose from a deficiency, the requesting spouse did not know and had no reason to know of the items giving rise to the deficiency.

(e) <u>Nonrequesting spouse's legal obligation</u>. The nonrequesting spouse has a legal obligation pursuant to a divorce decree or agreement to pay the outstanding liability. This will not be a factor weighing in favor of relief if the requesting spouse knew or had reason to know, at the time the divorce decree or agreement was entered into, that the nonrequesting spouse would not pay the liability.

(f) <u>Attributable to nonrequesting spouse</u>. The liability for which relief is sought is solely attributable to the nonrequesting spouse.

The following are the negative factors set forth in the revenue procedure, Rev. Proc. 2000-15, sec. 4.03(2), as they apply to this case:

(a) <u>Attributable to the requesting spouse</u>. The * * * item giving rise to the deficiency is attributable to the requesting spouse.

(b) <u>Knowledge, or reason to know</u>. A requesting spouse knew or had reason to know of the item giving rise to a deficiency * * * . This is an extremely strong factor weighing against relief. Nonetheless, when the factors in favor of equitable relief are unusually strong, it may be appropriate to grant relief under sec. 6015(f) * * * in very limited situations where the requesting spouse knew or had reason to know of an item giving rise to a deficiency.

(c) <u>Significant benefit</u>. The requesting spouse has significantly benefitted (beyond normal support) from the unpaid liability or items giving rise to the deficiency. See sec. 1.6013-5(b).

(d) <u>Lack of economic hardship</u>. The requesting spouse will not experience economic hardship (within the meaning of section 4.02(1)(c) of this revenue procedure) if relief from the liability is not granted.

(e) <u>Noncompliance with federal income tax laws</u>. The requesting spouse has not made a good faith effort to comply with federal income tax laws in the tax years following the tax year or years to which the request for relief relates.

(f) <u>Requesting spouse's legal obligation</u>.  The <u>requesting spouse</u> has a legal obligation pursuant to a divorce decree or agreement to pay the liability.

As previously discussed in detail in this opinion, we have found that both petitioner and Mr. Barnes were investors in the partnership, and we have accordingly found that the deficiencies are attributable equally to petitioner and Mr. Barnes.  In reviewing respondent's denial of section 6015(f) relief with respect to the portions of the deficiencies attributable to petitioner, we find petitioner's personal involvement as an investor to be a significant factor.  Another significant factor weighing against relief is that petitioner had reason to know of the understatements, as discussed above in connection with the application of section 6015(b).

There is no evidence that petitioner was abused by Mr. Barnes, or that petitioner was to any degree coerced into becoming an investor--even if petitioner went along with the investment in order to avoid conflict with Mr. Barnes or his family, she nevertheless became an investor voluntarily. Petitioner's arguments to the contrary are not supported by the record and are even contradicted by petitioner's own testimony. Finally, because petitioner has not shown that she would be unable to pay her reasonable basic living expenses, especially in light of the substantial continuing income that she and Mr. Edwards receive, petitioner has not shown that she would suffer

economic hardship if relief were not granted. See sec. 301.6343-1(b)(4), Proced. & Admin. Regs.; Rev. Proc. 2000-15, sec. 4.02(1)(c).

On the basis of the record as a whole in this case, we cannot say that respondent abused his discretion by acting arbitrarily, capriciously, or without sound basis in fact in denying petitioner's request for relief under section 6015(f).

To reflect the foregoing,

<u>Decision will be entered</u>
<u>under Rule 155</u>.